COMMISSIONER OF INTERNAL REVENUE *v.*
TUFTS ET AL.

No. 81–1536.   Argued November 29, 1982—Decided May 2, 1983

BLACKMUN, J., delivered the opinion for a unanimous Court. O'CONNOR, J., filed a concurring opinion, *post*, p. 317.

*Stuart A. Smith* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Archer, Michael L. Paup,* and *Gilbert S. Rothenberg.*

*Ronald M. Mankoff* argued the cause for respondents. With him on the brief was *Charles D. Pulman.**

JUSTICE BLACKMUN delivered the opinion of the Court.

Over 35 years ago, in *Crane* v. *Commissioner,* 331 U. S. 1 (1947), this Court ruled that a taxpayer, who sold property encumbered by a nonrecourse mortgage (the amount of the

*Briefs of *amici curiae* urging affirmance were filed by *Louis Regenstein* for the Empire Real Estate Board, Inc.; and by *Wayne G. Barnett, pro se.*

mortgage being less than the property's value), must include the unpaid balance of the mortgage in the computation of the amount the taxpayer realized on the sale. The case now before us presents the question whether the same rule applies when the unpaid amount of the nonrecourse mortgage exceeds the fair market value of the property sold.

I

On August 1, 1970, respondent Clark Pelt, a builder, and his wholly owned corporation, respondent Clark, Inc., formed a general partnership. The purpose of the partnership was to construct a 120-unit apartment complex in Duncanville, Tex., a Dallas suburb. Neither Pelt nor Clark, Inc., made any capital contribution to the partnership. Six days later, the partnership entered into a mortgage loan agreement with the Farm & Home Savings Association (F&H). Under the agreement, F&H was committed for a $1,851,500 loan for the complex. In return, the partnership executed a note and a deed of trust in favor of F&H. The partnership obtained the loan on a nonrecourse basis: neither the partnership nor its partners assumed any personal liability for repayment of the loan. Pelt later admitted four friends and relatives, respondents Tufts, Steger, Stephens, and Austin, as general partners. None of them contributed capital upon entering the partnership.

The construction of the complex was completed in August 1971. During 1971, each partner made small capital contributions to the partnership; in 1972, however, only Pelt made a contribution. The total of the partners' capital contributions was $44,212. In each tax year, all partners claimed as income tax deductions their allocable shares of ordinary losses and depreciation. The deductions taken by the partners in 1971 and 1972 totalled $439,972. Due to these contributions and deductions, the partnership's adjusted basis in the property in August 1972 was $1,455,740.

In 1971 and 1972, major employers in the Duncanville area laid off significant numbers of workers. As a result, the partnership's rental income was less than expected, and it was unable to make the payments due on the mortgage. Each partner, on August 28, 1972, sold his partnership interest to an unrelated third party, Fred Bayles. As consideration, Bayles agreed to reimburse each partner's sale expenses up to $250; he also assumed the nonrecourse mortgage.

On the date of transfer, the fair market value of the property did not exceed $1,400,000. Each partner reported the sale on his federal income tax return and indicated that a partnership loss of $55,740 had been sustained.[1] The Commissioner of Internal Revenue, on audit, determined that the sale resulted in a partnership capital gain of approximately $400,000. His theory was that the partnership had realized the full amount of the nonrecourse obligation.[2]

Relying on *Millar* v. *Commissioner*, 577 F. 2d 212, 215 (CA3), cert. denied, 439 U. S. 1046 (1978), the United States Tax Court, in an unreviewed decision, upheld the asserted deficiencies. 70 T. C. 756 (1978). The United States Court of Appeals for the Fifth Circuit reversed. 651 F. 2d 1058 (1981). That court expressly disagreed with the *Millar* analysis, and, in limiting *Crane* v. *Commissioner, supra*, to its facts, questioned the theoretical underpinnings of the *Crane*

---

[1] The loss was the difference between the adjusted basis, $1,455,740, and the fair market value of the property, $1,400,000. On their individual tax returns, the partners did not claim deductions for their respective shares of this loss. In their petitions to the Tax Court, however, the partners did claim the loss.

[2] The Commissioner determined the partnership's gain on the sale by subtracting the adjusted basis, $1,455,740, from the liability assumed by Bayles, $1,851,500. Of the resulting figure, $395,760, the Commissioner treated $348,661 as capital gain, pursuant to § 741 of the Internal Revenue Code of 1954, 26 U. S. C. § 741, and $47,099 as ordinary gain under the recapture provisions of § 1250 of the Code. The application of § 1250 in determining the character of the gain is not at issue here.

decision.   We granted certiorari to resolve the conflict.   456 U. S. 960 (1982).

## II

Section 752(d) of the Internal Revenue Code of 1954, 26 U. S. C. § 752(d), specifically provides that liabilities involved in the sale or exchange of a partnership interest are to "be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships."   Section 1001 governs the determination of gains and losses on the disposition of property.   Under § 1001(a), the gain or loss from a sale or other disposition of property is defined as the difference between "the amount realized" on the disposition and the property's adjusted basis. Subsection (b) of § 1001 defines "amount realized": "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."   At issue is the application of the latter provision to the disposition of property encumbered by a nonrecourse mortgage of an amount in excess of the property's fair market value.

## A

In *Crane* v. *Commissioner, supra,* this Court took the first and controlling step toward the resolution of this issue. Beulah B. Crane was the sole beneficiary under the will of her deceased husband.   At his death in January 1932, he owned an apartment building that was then mortgaged for an amount which proved to be equal to its fair market value, as determined for federal estate tax purposes.   The widow, of course, was not personally liable on the mortgage.   She operated the building for nearly seven years, hoping to turn it into a profitable venture; during that period, she claimed income tax deductions for depreciation, property taxes, interest, and operating expenses, but did not make payments upon the mortgage principal.   In computing her basis for the depreciation deductions, she included the full amount of the

mortgage debt.   In November 1938, with her hopes unfulfilled and the mortgagee threatening foreclosure, Mrs. Crane sold the building.   The purchaser took the property subject to the mortgage and paid Crane $3,000; of that amount, $500 went for the expenses of the sale.

Crane reported a gain of $2,500 on the transaction.   She reasoned that her basis in the property was zero (despite her earlier depreciation deductions based on including the amount of the mortgage) and that the amount she realized from the sale was simply the cash she received.   The Commissioner disputed this claim.   He asserted that Crane's basis in the property, under § 113(a)(5) of the Revenue Act of 1938, 52 Stat. 490 (the current version is § 1014 of the 1954 Code, as amended, 26 U. S. C. § 1014 (1976 ed. and Supp. V)), was the property's fair market value at the time of her husband's death, adjusted for depreciation in the interim, and that the amount realized was the net cash received plus the amount of the outstanding mortgage assumed by the purchaser.

In upholding the Commissioner's interpretation of § 113 (a)(5) of the 1938 Act,[3] the Court observed that to regard merely the taxpayer's equity in the property as her basis would lead to depreciation deductions less than the actual physical deterioration of the property, and would require the basis to be recomputed with each payment on the mortgage. 331 U. S., at 9–10.   The Court rejected Crane's claim that any loss due to depreciation belonged to the mortgagee. The effect of the Court's ruling was that the taxpayer's basis was the value of the property undiminished by the mortgage. *Id.*, at 11.

---

[3] Section 113(a)(5) defined the basis of "property . . . acquired by . . . devise . . . or by the decedent's estate from the decedent" as "the fair market value of such property at the time of such acquisition."   The Court interpreted the term "property" to refer to the physical land and buildings owned by Crane or the aggregate of her rights to control and dispose of them.   331 U. S., at 6.

The Court next proceeded to determine the amount realized under § 111(b) of the 1938 Act, 52 Stat. 484 (the current version is § 1001(b) of the 1954 Code, 26 U. S. C. § 1001(b)). In order to avoid the "absurdity," see 331 U. S., at 13, of Crane's realizing only $2,500 on the sale of property worth over a quarter of a million dollars, the Court treated the amount realized as it had treated basis, that is, by including the outstanding value of the mortgage. To do otherwise would have permitted Crane to recognize a tax loss unconnected with any actual economic loss. The Court refused to construe one section of the Revenue Act so as "to frustrate the Act as a whole." *Ibid.*

Crane, however, insisted that the nonrecourse nature of the mortgage required different treatment. The Court, for two reasons, disagreed. First, excluding the nonrecourse debt from the amount realized would result in the same absurdity and frustration of the Code. *Id.*, at 13–14. Second, the Court concluded that Crane obtained an economic benefit from the purchaser's assumption of the mortgage identical to the benefit conferred by the cancellation of personal debt. Because the value of the property in that case exceeded the amount of the mortgage, it was in Crane's economic interest to treat the mortgage as a personal obligation; only by so doing could she realize upon sale the appreciation in her equity represented by the $2,500 boot. The purchaser's assumption of the liability thus resulted in a taxable economic benefit to her, just as if she had been given, in addition to the boot, a sum of cash sufficient to satisfy the mortgage.[4]

---

[4] Crane also argued that even if the statute required the inclusion of the amount of the nonrecourse debt, that amount was not Sixteenth Amendment income because the overall transaction had been "by all dictates of common sense . . . a ruinous disaster." Brief for Petitioner in *Crane* v. *Commissioner*, O. T. 1946, No. 68, p. 51. The Court noted, however, that Crane had been entitled to and actually took depreciation deductions for nearly seven years. To allow her to exclude sums on which those deductions were based from the calculation of her taxable gain would permit her

In a footnote, pertinent to the present case, the Court observed:

> "Obviously, if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage. Consequently, a different problem might be encountered where a mortgagor abandoned the property or transferred it subject to the mortgage without receiving boot. That is not this case."' *Id.*, at 14, n. 37.

## B

This case presents that unresolved issue. We are disinclined to overrule *Crane*, and we conclude that the same rule applies when the unpaid amount of the nonrecourse mortgage exceeds the value of the property transferred. *Crane* ultimately does not rest on its limited theory of economic benefit; instead, we read *Crane* to have approved the Commissioner's decision to treat a nonrecourse mortgage in this context as a true loan. This approval underlies *Crane*'s holdings that the amount of the nonrecourse liability is to be included in calculating both the basis and the amount realized on disposition. That the amount of the loan exceeds the fair market value of the property thus becomes irrelevant.

When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer. When he fulfills the obligation, the repayment of the loan likewise has no effect on his tax liability.

Another consequence to the taxpayer from this obligation occurs when the taxpayer applies the loan proceeds to the purchase price of property used to secure the loan. Because of the obligation to repay, the taxpayer is entitled to include the amount of the loan in computing his basis in the property; the loan, under § 1012, is part of the taxpayer's cost of the

"a double deduction . . . on the same loss of assets." The Sixteenth Amendment, it was said, did not require that result. 331 U. S., at 15–16.

property. Although a different approach might have been taken with respect to a nonrecourse mortgage loan,[5] the Commissioner has chosen to accord it the same treatment he gives to a recourse mortgage loan. The Court approved that choice in *Crane*, and the respondents do not challenge it here. The choice and its resultant benefits to the taxpayer are predicated on the assumption that the mortgage will be repaid in full.

When encumbered property is sold or otherwise disposed of and the purchaser assumes the mortgage, the associated

---

[5] The Commissioner might have adopted the theory, implicit in Crane's contentions, that a nonrecourse mortgage is not true debt, but, instead, is a form of joint investment by the mortgagor and the mortgagee. On this approach, nonrecourse debt would be considered a contingent liability, under which the mortgagor's payments on the debt gradually increase his interest in the property while decreasing that of the mortgagee. Note, Federal Income Tax Treatment of Nonrecourse Debt, 82 Colum. L. Rev. 1498, 1514 (1982); Lurie, Mortgagor's Gain on Mortgaging Property for More than Cost Without Personal Liability, 6 Tax L. Rev. 319, 323 (1951); cf. Brief for Respondents 16 (nonrecourse debt resembles preferred stock). Because the taxpayer's investment in the property would not include the nonrecourse debt, the taxpayer would not be permitted to include that debt in basis. Note, 82 Colum. L. Rev., at 1515; cf. *Gibson Products Co. v. United States*, 637 F. 2d 1041, 1047–1048 (CA5 1981) (contingent nature of obligation prevents inclusion in basis of oil and gas leases of nonrecourse debt secured by leases, drilling equipment, and percentage of future production).

We express no view as to whether such an approach would be consistent with the statutory structure and, if so, and *Crane* were not on the books, whether that approach would be preferred over *Crane*'s analysis. We note only that the *Crane* Court's resolution of the basis issue presumed that when property is purchased with proceeds from a nonrecourse mortgage, the purchaser becomes the sole owner of the property. 331 U. S., at 6. Under the *Crane* approach, the mortgagee is entitled to no portion of the basis. *Id.*, at 10, n. 28. The nonrecourse mortgage is part of the mortgagor's investment in the property, and does not constitute a coinvestment by the mortgagee. But see Note, 82 Colum. L. Rev., at 1513 (treating nonrecourse mortgage as coinvestment by mortgagee and critically concluding that *Crane* departed from traditional analysis that basis is taxpayer's investment in property).

extinguishment of the mortgagor's obligation to repay is accounted for in the computation of the amount realized.[6]   See *United States* v. *Hendler*, 303 U. S. 564, 566–567 (1938). Because no difference between recourse and nonrecourse obligations is recognized in calculating basis,[7] *Crane* teaches that the Commissioner may ignore the nonrecourse nature of the obligation in determining the amount realized upon disposition of the encumbered property.   He thus may include in the amount realized the amount of the nonrecourse mortgage assumed by the purchaser.   The rationale for this treatment is that the original inclusion of the amount of the mortgage in basis rested on the assumption that the mortgagor incurred an obligation to repay.   Moreover, this treatment balances the fact that the mortgagor originally received the proceeds of the nonrecourse loan tax-free on the same assumption.

---

[6] In this case, respondents received the face value of their note as loan proceeds.   If respondents initially had given their note at a discount, the amount realized on the sale of the securing property might be limited to the funds actually received.   See *Commissioner* v. *Rail Joint Co.*, 61 F. 2d 751, 752 (CA2 1932) (cancellation of indebtedness); *Fashion Park, Inc.* v. *Commissioner*, 21 T. C. 600, 606 (1954) (same).   See generally J. Sneed, The Configurations of Gross Income 319 (1967) ("[I]t appears settled that the reacquisition of bonds at a discount by the obligor results in gain only to the extent the issue price, where this is less than par, exceeds the cost of reacquisition").

[7] The Commissioner's choice in *Crane* "laid the foundation stone of most tax shelters," Bittker, Tax Shelters, Nonrecourse Debt, and the *Crane* Case, 33 Tax L. Rev. 277, 283 (1978), by permitting taxpayers who bear no risk to take deductions on depreciable property.   Congress recently has acted to curb this avoidance device by forbidding a taxpayer to take depreciation deductions in excess of amounts he has at risk in the investment. Pub. L. 94–455, § 204(a), 90 Stat. 1531 (1976), 26 U. S. C. § 465; Pub. L. 95–600, §§ 201–204, 92 Stat. 2814–2817 (1978), 26 U. S. C. § 465(a) (1976 ed., Supp. V).   Real estate investments, however, are exempt from this prohibition.   § 465(c)(3)(D) (1976 ed., Supp. V).   Although this congressional action may foreshadow a day when nonrecourse and recourse debts will be treated differently, neither Congress nor the Commissioner has sought to alter *Crane*'s rule of including nonrecourse liability in both basis and the amount realized.

Unless the outstanding amount of the mortgage is deemed to be realized, the mortgagor effectively will have received untaxed income at the time the loan was extended and will have received an unwarranted increase in the basis of his property.[8] The Commissioner's interpretation of § 1001(b) in this fashion cannot be said to be unreasonable.

## C

The Commissioner in fact has applied this rule even when the fair market value of the property falls below the amount of the nonrecourse obligation. Treas. Reg. § 1.1001–2(b), 26 CFR § 1.1001–2(b) (1982);[9] Rev. Rul. 76–111, 1976–1 Cum. Bull. 214. Because the theory on which the rule is based applies equally in this situation, see *Millar* v. *Commissioner*, 67 T. C. 656, 660 (1977), aff'd on this issue, 577 F. 2d 212, 215–216 (CA3), cert. denied, 439 U. S. 1046 (1978);[10] *Mendham Corp.* v. *Commissioner*, 9 T. C. 320, 323–324 (1947); *Lutz & Schramm Co.* v. *Commissioner*, 1 T. C. 682, 688–689 (1943), we have no reason, after *Crane*, to question this treatment.[11]

---

[8] Although the *Crane* rule has some affinity with the tax benefit rule, see Bittker, *supra*, at 282; Del Cotto, Sales and Other Dispositions of Property Under Section 1001: The Taxable Event, Amount Realized and Related Problems of Basis, 26 Buffalo L. Rev. 219, 323–324 (1977), the analysis we adopt is different. Our analysis applies even in the situation in which no deductions are taken. It focuses on the obligation to repay and its subsequent extinguishment, not on the taking and recovery of deductions. See generally Note, 82 Colum. L. Rev., at 1526–1529.

[9] The regulation was promulgated while this case was pending before the Court of Appeals for the Fifth Circuit. T. D. 7741, 45 Fed. Reg. 81743, 1981–1 Cum. Bull. 430 (1980). It merely formalized the Commissioner's prior interpretation, however.

[10] The Court of Appeals for the Third Circuit in *Millar* affirmed the Tax Court on the theory that inclusion of nonrecourse liability in the amount realized was necessary to prevent the taxpayer from enjoying a double deduction. 577 F. 2d, at 215; cf. n. 4, *supra*. Because we resolve the question on another ground, we do not address the validity of the double deduction rationale.

[11] Professor Wayne G. Barnett, as *amicus* in the present case, argues that the liability and property portions of the transaction should be ac-

Respondents received a mortgage loan with the concomitant obligation to repay by the year 2012. The only difference between that mortgage and one on which the borrower

---

counted for separately. Under his view, there was a transfer of the property for $1.4 million, and there was a cancellation of the $1.85 million obligation for a payment of $1.4 million. The former resulted in a capital loss of $50,000, and the latter in the realization of $450,000 of ordinary income. Taxation of the ordinary income might be deferred under § 108 by a reduction of respondents' bases in their partnership interests.

Although this indeed could be a justifiable mode of analysis, it has not been adopted by the Commissioner. Nor is there anything to indicate that the Code requires the Commissioner to adopt it. We note that Professor Barnett's approach does assume that recourse and nonrecourse debt may be treated identically.

The Commissioner also has chosen not to characterize the transaction as cancellation of indebtedness. We are not presented with and do not decide the contours of the cancellation-of-indebtedness doctrine. We note only that our approach does not fall within certain prior interpretations of that doctrine. In one view, the doctrine rests on the same initial premise as our analysis here—an obligation to repay—but the doctrine relies on a freeing-of-assets theory to attribute ordinary income to the debtor upon cancellation. See *Commissioner* v. *Jacobson*, 336 U. S. 28, 38–40 (1949); *United States* v. *Kirby Lumber Co.*, 284 U. S. 1, 3 (1931). According to that view, when nonrecourse debt is forgiven, the debtor's basis in the securing property is reduced by the amount of debt canceled, and realization of income is deferred until the sale of the property. See *Fulton Gold Corp.* v. *Commissioner*, 31 B. T. A. 519, 520 (1934). Because that interpretation attributes income only when assets are freed, however, an insolvent debtor realizes income just to the extent his assets exceed his liabilities after the cancellation. *Lakeland Grocery Co.* v. *Commissioner*, 36 B. T. A. 289, 292 (1937). Similarly, if the nonrecourse indebtedness exceeds the value of the securing property, the taxpayer never realizes the full amount of the obligation canceled because the tax law has not recognized negative basis.

Although the economic benefit prong of *Crane* also relies on a freeing-of-assets theory, that theory is irrelevant to our broader approach. In the context of a sale or disposition of property under § 1001, the extinguishment of the obligation to repay is not ordinary income; instead, the amount of the canceled debt is included in the amount realized, and enters into the computation of gain or loss on the disposition of property. According to *Crane*, this treatment is no different when the obligation is nonrecourse: the basis is not reduced as in the cancellation-of-indebtedness context, and

is personally liable is that the mortgagee's remedy is limited to foreclosing on the securing property. This difference does not alter the nature of the obligation; its only effect is to shift from the borrower to the lender any potential loss caused by devaluation of the property.[12] If the fair market value of the property falls below the amount of the outstanding obligation, the mortgagee's ability to protect its interests is impaired, for the mortgagor is free to abandon the property to the mortgagee and be relieved of his obligation.

This, however, does not erase the fact that the mortgagor received the loan proceeds tax-free and included them in his basis on the understanding that he had an obligation to repay the full amount. See *Woodsam Associates, Inc.* v. *Commissioner*, 198 F. 2d 357, 359 (CA2 1952); Bittker, *supra* n. 7, at 284. When the obligation is canceled, the mortgagor is relieved of his responsibility to repay the sum he originally received and thus realizes value to that extent within the meaning of § 1001(b). From the mortgagor's point of view, when his obligation is assumed by a third party who purchases the encumbered property, it is as if the mortgagor first had been paid with cash borrowed by the third party from the mortgagee on a nonrecourse basis, and then had used the cash to satisfy his obligation to the mortgagee.

Moreover, this approach avoids the absurdity the Court recognized in *Crane*. Because of the remedy accompanying the mortgage in the nonrecourse situation, the depreciation

---

the full value of the outstanding liability is included in the amount realized. Thus, the problem of negative basis is avoided.

[12] In his opinion for the Court of Appeals in *Crane*, Judge Learned Hand observed:

"[The mortgagor] has all the income from the property; he manages it; he may sell it; any increase in its value goes to him; any decrease falls on him, until the value goes below the amount of the lien. . . . When therefore upon a sale the mortgagor makes an allowance to the vendee of the amount of the lien, he secures a release from a charge upon his property quite as though the vendee had paid him the full price on condition that before he took title the lien should be cleared. . . ." 153 F. 2d 504, 506 (CA2 1945).

in the fair market value of the property is relevant economically only to the mortgagee, who by lending on a nonrecourse basis remains at risk. To permit the taxpayer to limit his realization to the fair market value of the property would be to recognize a tax loss for which he has suffered no corresponding economic loss.[13] Such a result would be to construe "one section of the Act . . . so as . . . to defeat the intention of another or to frustrate the Act as a whole." 331 U. S., at 13.

In the specific circumstances of *Crane*, the economic benefit theory did support the Commissioner's treatment of the nonrecourse mortgage as a personal obligation. The footnote in *Crane* acknowledged the limitations of that theory when applied to a different set of facts. *Crane* also stands for the broader proposition, however, that a nonrecourse loan should be treated as a true loan. We therefore hold that a taxpayer must account for the proceeds of obligations he has received tax-free and included in basis. Nothing in either § 1001(b) or in the Court's prior decisions requires the Commissioner to permit a taxpayer to treat a sale of encumbered property asymmetrically, by including the proceeds of the nonrecourse obligation in basis but not accounting for the proceeds upon transfer of the encumbered property. See

---

[13] In the present case, the Government bore the ultimate loss. The nonrecourse mortgage was extended to respondents only after the planned complex was endorsed for mortgage insurance under §§ 221(b) and (d)(4) of the National Housing Act, 12 U. S. C. §§ 1715*l*(b) and (d)(4) (1976 ed. and Supp. V). After acquiring the complex from respondents, Bayles operated it for a few years, but was unable to make it profitable. In 1974, F&H foreclosed, and the Department of Housing and Urban Development paid off the lender to obtain title. In 1976, the Department sold the complex to another developer for $1,502,000. The sale was financed by the Department's taking back a note for $1,314,800 and a nonrecourse mortgage. To fail to recognize the value of the nonrecourse loan in the amount realized, therefore, would permit respondents to compound the Government's loss by claiming the tax benefits of that loss for themselves.

*Estate of Levine* v. *Commissioner*, 634 F. 2d 12, 15 (CA2 1980).

## III

Relying on the Code's § 752(c), 26 U. S. C. § 752(c), however, respondents argue that Congress has provided for precisely this type of asymmetrical treatment in the sale or disposition of partnership property. Section 752 prescribes the tax treatment of certain partnership transactions,[14] and § 752(c) provides that "[f]or purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property." Section 752(c) could be read to apply to a sale or disposition of partnership property, and thus to limit the amount realized to the fair market value of the property transferred. Inconsistent with this interpretation, however, is the language of § 752(d), which specifically mandates that partnership liabilities be treated "in the same manner as liabilities in connection with the sale or exchange

---

[14] Section 752 provides:

"(a) Increase in partner's liabilities

"Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

"(b) Decrease in partner's liabilities

"Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

"(c) Liability to which property is subject

"For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

"(d) Sale or exchange of an interest

"In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships."

of property not associated with partnerships." The apparent conflict of these subsections renders the facial meaning of the statute ambiguous, and therefore we must look to the statute's structure and legislative history.

Subsections (a) and (b) of § 752 prescribe rules for the treatment of liabilities in transactions between a partner and his partnership, and thus for determining the partner's adjusted basis in his partnership interest. Under § 704(d), a partner's distributive share of partnership losses is limited to the adjusted basis of his partnership interest. 26 U. S. C. § 704(d) (1976 ed., Supp. V); see Perry, Limited Partnerships and Tax Shelters: The *Crane* Rule Goes Public, 27 Tax L. Rev. 525, 543 (1972). When partnership liabilities are increased or when a partner takes on the liabilities of the partnership, § 752(a) treats the amount of the increase or the amount assumed as a contribution by the partner to the partnership. This treatment results in an increase in the adjusted basis of the partner's interest and a concomitant increase in the § 704(d) limit on his distributive share of any partnership loss. Conversely, under § 752(b), a decrease in partnership liabilities or the assumption of a partner's liabilities by the partnership has the effect of a distribution, thereby reducing the limit on the partner's distributive share of the partnership's losses. When property encumbered by liabilities is contributed to or distributed from the partnership, § 752(c) prescribes that the liability shall be considered to be assumed by the transferee only to the extent of the property's fair market value. Treas. Reg. § 1.752–1(c), 26 CFR § 1.752–1(c) (1982).

The legislative history indicates that Congress contemplated this application of § 752(c). Mention of the fair market value limitation occurs only in the context of transactions under subsections (a) and (b).[15] The sole reference to subsec-

---

[15] "The transfer of property subject to a liability by a partner to a partnership, or by the partnership to a partner, shall, to the extent of the fair market value of such property, be considered a transfer of the amount of

tion (d) does not discuss the limitation.[16]  While the legislative history is certainly not conclusive, it indicates that the fair market value limitation of § 752(c) was directed to transactions between a partner and his partnership.[17]  1 A. Willis, J. Pennell, & P. Postlewaite, Partnership Taxation § 44.03, p. 44–3 (3d ed. 1981); Simmons, *Tufts* v. *Commissioner: Amount Realized Limited to Fair Market Value*, 15 U. C. D. L. Rev. 577, 611–613 (1982).

By placing a fair market value limitation on liabilities connected with property contributions to and distributions from partnerships under subsections (a) and (b), Congress apparently intended § 752(c) to prevent a partner from inflating the basis of his partnership interest.  Otherwise, a partner with no additional capital at risk in the partnership could raise the § 704(d) limit on his distributive share of partnership losses or could reduce his taxable gain upon disposition of his partner-

---

the liability along with the property."  H. R. Rep. No. 1337, 83d Cong., 2d Sess., A236 (1954); S. Rep. No. 1622, 83d Cong., 2d Sess., 405 (1954).

[16] "When a partnership interest is sold or exchanged, the general rule for the treatment of the sale or exchange of property subject to liabilities will be applied."  H. R. Rep. No. 1337, at A236–A237; S. Rep. No. 1622, at 405.  These Reports then set out an example of subsection (d)'s application, which does not indicate whether the debt is recourse or nonrecourse.

[17] The Treasury Regulations support this view.  The Regulations interpreting § 752(c) state:

"Where property subject to a liability is contributed by a partner to a partnership, or distributed by a partnership to a partner, the amount of the liability, to an extent not exceeding the fair market value of the property at the time of the contribution or distribution, shall be considered as a liability assumed by the transferee."  § 1.752–1(c), 26 CFR § 1.752–1(c) (1982).

The Regulations also contain an example applying the fair market limitation to a contribution of encumbered property by a partner to a partnership.  *Ibid.*  The Regulations interpreting § 752(d) make no mention of the fair market limitation.  § 752–1(d).  Both Regulations were issued contemporaneously with the passage of the statute, T. D. 6175, 1956–1 Cum. Bull. 211, and are entitled to deference as an administrative interpretation of the statute.  See *Commissioner* v. *South Texas Lumber Co.*, 333 U. S. 496, 501 (1948).

ship interest.　See Newman, The Resurgence of Footnote 37: *Tufts* v. *Commissioner*, 18 Wake Forest L. Rev. 1, 16, n. 116 (1982).　There is no potential for similar abuse in the context of § 752(d) sales of partnership interests to unrelated third parties.　In light of the above, we interpret subsection (c) to apply only to § 752(a) and (b) transactions, and not to limit the amount realized in a sale or exchange of a partnership interest under § 752(d).

## IV

When a taxpayer sells or disposes of property encumbered by a nonrecourse obligation, the Commissioner properly requires him to include among the assets realized the outstanding amount of the obligation.　The fair market value of the property is irrelevant to this calculation.　We find this interpretation to be consistent with *Crane* v. *Commissioner*, 331 U. S. 1 (1947), and to implement the statutory mandate in a reasonable manner.　*National Muffler Dealers Assn.* v. *United States*, 440 U. S. 472, 476 (1979).

The judgment of the Court of Appeals is therefore reversed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

I concur in the opinion of the Court, accepting the view of the Commissioner.　I do not, however, endorse the Commissioner's view.　Indeed, were we writing on a slate clean except for the decision in *Crane* v. *Commissioner*, 331 U. S. 1 (1947), I would take quite a different approach—that urged upon us by Professor Barnett as *amicus*.

*Crane* established that a taxpayer could treat property as entirely his own, in spite of the "coinvestment" provided by his mortgagee in the form of a nonrecourse loan.　That is, the full basis of the property, with all its tax consequences, belongs to the mortgagor.　That rule alone, though, does not in any way tie nonrecourse debt to the cost of property or to the proceeds upon disposition.　I see no reason to treat the

purchase, ownership, and eventual disposition of property differently because the taxpayer also takes out a mortgage, an independent transaction. In this case, the taxpayer purchased property, using nonrecourse financing, and sold it after it declined in value to a buyer who assumed the mortgage. There is no economic difference between the events in this case and a case in which the taxpayer buys property with cash; later obtains a nonrecourse loan by pledging the property as security; still later, using cash on hand, buys off the mortgage for the market value of the devalued property; and finally sells the property to a third party for its market value.

The logical way to treat both this case and the hypothesized case is to separate the two aspects of these events and to consider, first, the ownership and sale of the property, and, second, the arrangement and retirement of the loan. Under *Crane*, the fair market value of the property on the date of acquisition—the purchase price—represents the taxpayer's basis in the property, and the fair market value on the date of disposition represents the proceeds on sale. The benefit received by the taxpayer in return for the property is the cancellation of a mortgage that is worth no more than the fair market value of the property, for that is all the mortgagee can expect to collect on the mortgage. His gain or loss on the disposition of the property equals the difference between the proceeds and the cost of acquisition. Thus, the taxation of the transaction *in property* reflects the economic fate of the *property*. If the property has declined in value, as was the case here, the taxpayer recognizes a loss on the disposition of the property. The new purchaser then takes as his basis the fair market value as of the date of the sale. See, *e. g.*, *United States* v. *Davis*, 370 U. S. 65, 72 (1962); *Gibson Products Co.* v. *United States*, 637 F. 2d 1041, 1045, n. 8 (CA5 1981) (dictum); see generally Treas. Reg. § 1.1001–2(a)(3), 26 CFR § 1.1001–2(a)(3) (1982); 2 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 41.2.2., pp. 41–10—41–11 (1981).

In the separate borrowing transaction, the taxpayer acquires cash from the mortgagee. He need not recognize income at that time, of course, because he also incurs an obligation to repay the money. Later, though, when he is able to satisfy the debt by surrendering property that is worth less than the face amount of the debt, we have a classic situation of cancellation of indebtedness, requiring the taxpayer to recognize income in the amount of the difference between the proceeds of the loan and the amount for which he is able to satisfy his creditor. 26 U. S. C. § 61(a)(12). The taxation of the financing transaction then reflects the economic fate of the loan.

The reason that separation of the two aspects of the events in this case is important is, of course, that the Code treats different sorts of income differently. A gain on the sale of the property may qualify for capital gains treatment, §§ 1202, 1221 (1976 ed. and Supp. V), while the cancellation of indebtedness is ordinary income, but income that the taxpayer may be able to defer. §§ 108, 1017 (1976 ed., Supp. V). Not only does Professor Barnett's theory permit us to accord appropriate treatment to each of the two types of income or loss present in these sorts of transactions, it also restores continuity to the system by making the taxpayer-seller's proceeds on the disposition of property equal to the purchaser's basis in the property. Further, and most important, it allows us to tax the events in this case in the same way that we tax the economically identical hypothesized transaction.

Persuaded though I am by the logical coherence and internal consistency of this approach, I agree with the Court's decision not to adopt it judicially. We do not write on a slate marked only by *Crane*. The Commissioner's longstanding position, Rev. Rul. 76–111, 1976–1 Cum. Bull. 214, is now reflected in the regulations. Treas. Reg. § 1.1001–2, 26 CFR § 1.1001–2 (1982). In the light of the numerous cases in the lower courts including the amount of the unrepaid proceeds of the mortgage in the proceeds on sale or disposition, see,

*e. g.*, *Estate of Levine* v. *Commissioner*, 634 F. 2d 12, 15 (CA2 1980); *Millar* v. *Commissioner*, 577 F. 2d 212 (CA3), cert. denied, 439 U. S. 1046 (1978); *Estate of Delman* v. *Commissioner*, 73 T. C. 15, 28–30 (1979); *Peninsula Properties Co., Ltd.* v. *Commissioner*, 47 B. T. A. 84, 92 (1942), it is difficult to conclude that the Commissioner's interpretation of the statute exceeds the bounds of his discretion. As the Court's opinion demonstrates, his interpretation is defensible. One can reasonably read § 1001(b)'s reference to "the amount realized *from* the sale or other disposition of property" (emphasis added) to permit the Commissioner to collapse the two aspects of the transaction. As long as his view is a reasonable reading of § 1001(b), we should defer to the regulations promulgated by the agency charged with interpretation of the statute. *National Muffler Dealers Assn.* v. *United States*, 440 U. S. 472, 488–489 (1979); *United States* v. *Correll*, 389 U. S. 299, 307 (1967); see also *Fulman* v. *United States*, 434 U. S. 528, 534 (1978). Accordingly, I concur.