Fortune ODEND'HAL, Jr., and Gloria P. Odend'hal; Fortune Odend'hal, Jr.; William J. Cassidy and Clotilda G. Cassidy; Dean L. Mann and Beverly D. Mann; Ivan V. Magal and Leah R. Magal; Larry M. Stanton and Esther M. Stanton; Robert M. Allen and Frances D. Allen; Charles C. Yu and Marie S. Yu; Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 83–2210.

United States Court of Appeals, Fourth Circuit.

Argued Aug. 29, 1984.

Decided Nov. 20, 1984.

Scott P. Crampton, Washington, D.C. (MacDonald, McInerny, Guandolo, Jordan & Crampton, James Dewey O'Brien, Washington, D.C., on brief), for appellants.

Michael J. Roach, Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Ann B. Durney, Tax Div., Dept. of Justice, Washington, D.C., on brief), for appellee.

Before WINTER, Chief Judge, SPROUSE, Circuit Judge, and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

Seven taxpayers in ten consolidated cases appeal from the decisions of the Tax Court determining deficiencies in their income taxes aggregating $496,525.32 for

various years within the period 1973–77. The Tax Court sustained the Commissioner's determination that taxpayers were not entitled to deduct depreciation, rental and interest expenses arising from their ownership of a warehouse and food processing facility located on 5.8 acres of land in Cincinnati, Ohio. Taxpayers purchased the facility in December 1972 for $80,000 in cash and $3,920,000 in nonrecourse notes secured by a purchase money mortgage, for a total stated price of $4 million. The Tax Court ruled that the fair market value of the property when purchased by taxpayers did not exceed $2 million, that because of the wide discrepancy between market value and the amount of the nonrecourse notes the latter did not represent genuine indebtedness, that therefore taxpayers could not include the nonrecourse amount in their depreciable basis, and that they could deduct interest and other items only to the extent of their income from the property. *Odend'hal v. Commissioner*, 80 T.C. 588 (1983).

On appeal, taxpayers contend that, as a factual matter, the Tax Court's finding as to the real cost of the property was clearly erroneous and that, as a matter of law, the Tax Court was bound to recognize the nonrecourse amount for purposes of computing depreciation and the interest deduction. For the latter proposition they rely on *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), a case decided after the Tax Court decided the instant litigation. We find no merit in either contention and so we affirm the decision of the Tax Court. We remand the case, however, and require the Tax Court to determine how the allowable amount should be apportioned among the interest, rental expenses, taxes and depreciation deductions.

## I.

The published opinion of the Tax Court contains extensive and detailed findings of fact. It is therefore unnecessary for us to recite them at length. We will begin, however, with a summary of the transaction in which taxpayers participated and some prior history of transactions involving the property.

Taxpayers are seven of ten individuals who acquired the improvements on the land, a lease on the land with the right to extend it for 99 years and the benefits of a long-term lease of the improvements made to The Kroger Company (Kroger), which had owned the property until 1951. Taxpayers' acquisition was promoted by Charles M. Fairchild, a real estate syndicator and developer, and his associates. The purchase price was $4 million, paid $80,000 in cash and $3,920,000 in nonrecourse notes secured by a 15-year nonrecourse mortgage. The principal of the mortgage was due in a balloon payment on November 30, 1987, and interest was payable at varying rates during the term of the mortgage. Fairchild and his associates represented that if depreciation was calculated on a useful life of 14.5 years, the cost of leasing the land, mortgage interest and depreciation, less income from Kroger, would result in a negative cash flow before taxes, but anticipated income tax savings for an investor in the 50% tax bracket would convert the negative cash flow from the investment into a positive after tax cash flow. Indeed it was represented that the total positive after-tax cash flow would aggregate $1,238,781 over a 15-year period. The acquisition and method of financing are what is called in common parlance a tax shelter.

Kroger, which apparently developed the property, sold it in fee in 1951 to Union Central Life Insurance Company (Union Central) for $5 million in cash under a sale-leaseback arrangement entitling Kroger to occupy the premises for a term of 25 years with an option for four 5-year renewals. Kroger's rent was calculated to return Union Central's original investment over the initial term with interest at the rate of 4.5%. In 1967 Union Central sold the property to Fairchild for $2,670,000, which was approximately Union Central's unamortized

investment balance.[1] Fairchild paid $115,-000 in cash and gave a nonrecourse promissory note for $2,555,000 secured by a first mortgage to be paid in 110 monthly installments with varying rates of interest.

Immediately after acquiring the property from Union Central, Fairchild transferred it to a group of investors (the Burwell group) for a stated consideration of $5 million. This consisted of payment of $100,-000 in cash, a credit of $2,555,000 for the nonrecourse note and mortgage that Fairchild had given to Union Central (to which the rights of the Burwell group were subject), and a series of 10 nonrecourse promissory notes of $233,000 each (plus another note for $15,000) secured by a second mortgage on the property.[2]

As soon as taxpayers committed themselves to Fairchild's promotion, the Burwell group conveyed the improvements on the Kroger property and the benefits of the Kroger lease to Realty Corporation of America (RCA), a corporation controlled by Fairchild, and by a separate conveyance leased the land under the improvements for a term extendable to 99 years to Management Properties, Inc. (Management), another corporation controlled by Fairchild, at varying stated annual rentals. In consideration of the conveyance of the improvements and the Kroger lease, RCA paid $5,000 in cash and gave $463,000 in notes secured by a third mortgage on the property. It acquired the improvements and the Kroger lease subject to the $1,339,000 due under the first mortgage and subject also to $233,000 due under the second mortgage. The latter was to ensure payment of the note assigned to Georgetown University, see n. 2, supra, but the Burwell group in effect promised that RCA would not be subject to the second mortgage to the extent that the mortgage secured performance on the other Burwell notes.

Fairchild then caused RCA and Management, respectively, to convey the improvements and the benefits of the Kroger lease to taxpayers and to sublease to them the underlying land for a term extendable to 99 years. The stated price for the improvements and the Kroger lease was $4 million, consisting of $80,000 in cash and $3,920,000 in nonrecourse promissory notes. The principal of the notes was due in a balloon payment on November 30, 1987. Under the ground lease, taxpayers were required to pay an annual rent in stated amounts which could be increased if the rent paid by Kroger was increased.

## II.

◼ We conclude that the Tax Court's finding that the property interests acquired by taxpayers at the time of their acquisition did not have a fair market value in excess of $2 million is not clearly erroneous.

In the trial of the case, the government presented the testimony of two qualified real estate appraisers. Both agreed that the appropriate method of valuing an interest in property subject to a long-term lease, such as the lease to Kroger in this case, is to reduce the anticipated rental income to present value at an appropriate rate of discount and to add the value of the reversion at the end of the lease, likewise discounted to present value. Using this method and employing a 9% rate of interest, one appraiser valued taxpayers' property at $1,990,125. The other expert, using an 8.5% rate of interest and a somewhat different method of evaluating the reversionary interest, valued their property at $1,711,597. Taxpayers presented no expert testimony from a qualified real estate appraiser that their property was worth $4 million.

1. The Tax Court found that Union Central calculated the sales price as the value of the income from the property plus the value of its future possessory interest.

2. Fairchild thereafter assigned one of the $233,-000 Burwell notes and a corresponding 10% interest in the second mortgage to Georgetown University, which had supplied the $115,000 cash paid by Fairchild to Union Central when he acquired the property. Later references to the Burwell notes collectively are to the remaining 9 notes of $233,000 each.

The testimony of the government's experts was corroborated by evidence of the sale from Union Central to Fairchild. This was obviously an arm's length transaction and the consideration was $2,670,000. This transaction occurred in 1967. It is true, of course, that Fairchild almost immediately sold the property to the Burwell group for a purported consideration of $5 million and the Burwell group in 1973 resold the property to a Fairchild corporation for a purported consideration of $4,134,018. Taxpayers place principal reliance on these transactions to support their argument that the Tax Court's findings as to value is clearly erroneous. We therefore analyze these transactions in greater detail.

At the outset we note that there is nothing in the record to show how or why, with regard to the 1967 sale by Fairchild to the Burwell group, the value of the property should effectively double within the thirty days between the time that Fairchild acquired the property and the date on which it was sold to the Burwell group. Nevertheless the parties to the sale to the Burwell group all testified that the transaction was conducted at arm's length.

The Tax Court concluded that neither of these transactions indicated that the value of the property was in excess of $2 million. It rejected the indication of value of $5 million implicit in the 1967 sale by Fairchild to the Burwell group because Fairchild had just purchased the property from Union Central for $2,670,000. It also rejected the indication of $4,134,018 of value in the 1973 sale by the Burwell group to RCA because it found that the actual consideration was only $2,040,000:

> RCA did not take subject to all 10 Burwell notes. RCA took subject only to the Burwell note held by Georgetown University. The Burwell group promised to hold RCA harmless on the other 9 Bur-

well notes. Accordingly, the purchase price was only $2,040,000.

80 T.C. at 612.

Taxpayers contend that RCA did assume responsibility for the Burwell notes and that therefore their aggregate value ($2,097,000) was part of the consideration for the sale from the Burwell group to RCA. Our examination of the agreement between the Burwell group and the RCA indicates otherwise. That agreement states that the purchase price is: (a) the sum of $468,000, payable $5,000 in cash and $463,000 by a nonrecourse note secured by a nonrecourse mortgage, (b) an amount equal to the unpaid balance of the first mortgage ($1,339,000), and (c) "Two Hundred Thirty-Three Thousand Dollars ($233,000.00) by the Purchaser [RCA] taking title subject to a second mortgage dated May 1, 1967 securing a note in said amount now held by Georgetown University on said property." The agreement further provides:

> At the discretion of the Sellers, they can pay off the remaining existing Two Million Ninety-Seven Thousand Dollars ($2,097,000.00) second mortgage on said property with the Fairtown Joint Venture of Washington, D.C. or permit same to remain thereon in which event the Sellers agree that notwithstanding the above terms for payment hereunder, no demand for payment and no payment shall be due on that portion of the principal of said Four Hundred Sixty-Three Thousand Dollars ($463,000.00) of notes until said Fairtown Joint Venture mortgage has been discharged and until the discharge thereof the responsibility of the Sellers shall continue in accordance with the terms and conditions of the Fairtown Joint Venture mortgage aforesaid.[3]

We deem the quoted language together with the description of the purchase price to continue the obligation of the Burwell group to pay the second mortgage except with regard to the Georgetown University

---

**3.** The "Fairtown Joint Venture" is the agreement between Fairchild and Georgetown University under which Georgetown advanced $115,000 to Fairchild to permit him to buy the property from Union Central and Fairchild agreed to give Georgetown a share of the profit on resale of the property.

share. Of course RCA might be required, by operation of law, to pay the entire unpaid balance of the second mortgage to protect its investment if the Burwell group defaulted. But even then RCA would be entitled to withhold payment of its note until the Burwell group performed. Whether described as a promise to hold RCA harmless or as something else, it appears clear to us that the parties did not intend that RCA pay the second mortgage, except for $233,000, and therefore the unpaid balance of the second mortgage, less $233,000, i.e., $2,097,000, should not be deemed consideration for the purchase. Because of this conclusion, we think that the Tax Court's finding that the Fairchild sale to the Burwell group at a purported consideration of $5 million was "incredible" as an indication of fair market value and was therefore not persuasive on the issue of value at the time of the sale to taxpayers was permissible and not clearly erroneous.

### III.

■ If, as a matter of fact, the fair market value of the property is less than that financed by a nonrecourse loan, the authorities hold that the principal of the nonrecourse loan which exceeds fair market value does not represent a real investment in the property by a taxpayer and he may not include that nonrecourse amount in his basis for depreciation. *See Brannen v. Commissioner*, 722 F.2d 695 (11 Cir. 1984). In addition, the interest paid on the loan is not allowable as an interest deduction. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9 Cir.1976). Basis for depreciation usually includes the amount of any indebtedness incurred or assumed by the purchaser in connection with the purchase of the property, *see Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), because the taxpayer has an obligation to pay the debt. When the debt is a nonrecourse loan, the principal amount of the loan is included in the taxpayer's basis so long as the fair market value of the property is at least equal to the amount of the nonrecourse debt at the

time it was incurred, because the taxpayer, even though he has no personal liability at stake, has an economic incentive to pay off the debt rather than to lose the collateral. But if the stated price financed by nonrecourse debt exceeds the fair market value of the property, to the extent of the excess, the taxpayer has no equity in the property to protect and no economic incentive to pay off the debt.

Taxpayers contend, however, that *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), requires that, irrespective of market value or income from the property, the Commissioner is required to recognize the principal amount of the nonrecourse obligation as part of the basis for depreciation and the interest payable thereon as a deductible expense. Our analysis and understanding of *Tufts* is to the contrary.

*Tufts* dealt with an issue which was suggested by *Crane v. Commissioner*, 331 U.S. 1, 14 n. 37, 67 S.Ct. 1047, 1054 n. 37, 91 L.Ed. 1301 (1947), but not reached in that case. *Crane* held that a taxpayer who sold property encumbered by a nonrecourse mortgage, the principal amount of which was less than the value of the property, must include the unpaid balance of the mortgage in the computation of the amount the taxpayer realized on the sale. *Tufts* held that the same rule applies when the unpaid amount of the nonrecourse mortgage exceeds the fair market value of the property at the time of the sale.

In *Tufts* a partnership financed the construction of an apartment complex by a nonrecourse mortgage in the amount of $1,851,500. The mortgage was extended by an institutional lender, and it was government-insured. From all that appears, the principal amount of the mortgage did not exceed the fair market value of the complex when it was completed. For two years after completion, all partners claimed as income tax deductions their allocable shares of losses and depreciation computed on a basis which included the principal amount of the nonrecourse mortgage. Shortly after completion of the com-

plex, rental income decreased below expectations as a result of adverse economic conditions in the area and the mortgage became in default. Each partner then sold his interest in the property to a third party for a nominal amount plus assumption by the third party of the nonrecourse mortgage. On the date of transfer of ownership, the partnership's adjusted basis in the property was $1,455,740, and the property's fair market value did not exceed $1,400,-000. Each partner claimed as a tax loss his share of the difference between the selling price and the fair market value of the property ($55,740). The Commissioner, however, took the position that each partner had realized a gain because the partnership had realized the full amount of the nonrecourse obligation. The Court sustained the Commissioner's position. It reasoned that in light of the Commissioner's long-standing policy, approved in *Crane,* of treating a nonrecourse mortgage "in this context as a true loan", 461 U.S. at 307, 103 S.Ct. at 1831, with the result that a taxpayer may realize the benefit of depreciation on a purchase financed by nonrecourse debt, it was not unreasonable for the Commissioner to treat assumption of the nonrecourse debt as part of the selling price in determining the amount realized by a taxpayer upon disposition of the encumbered property even when the unpaid amount of the nonrecourse obligation exceeds the value of the property transferred. The Court's rationale was thus essentially one of symmetry— the concept that if a tax benefit is claimed and allowed from debts incurred under nonrecourse obligations, the taxpayer must treat the transfer of those obligations as part of the consideration for a sale of the property.

We see nothing, however, in *Tufts* to indicate that the nonrecourse debt in the instant case must be recognized for purposes of computing allowable depreciation or allowable interest deductions. The instant case is not one where, having taken depreciation on property on a basis which includes nonrecourse debt incurred in acquisition of the property, a taxpayer seeks to ignore a transfer of the nonrecourse debt in computing gain or loss from a subsequent sale of the property.[4] The issue here is what are proper deductions for depreciation and interest. We see nothing in *Tufts* to alter the well-established rules that a taxpayer may not inflate his depreciation deductions, as did taxpayers here, by including in his basis for depreciation nonrecourse debt when that debt so far exceeds actual value at the time that it is incurred that there is no economic incentive to pay it, and similarly that a taxpayer may not claim an interest deduction where he has neither personal liability nor economic incentive to pay. In reaching these conclusions, we note that while *Tufts* did state that "Crane also stands for the broader proposition ... that a nonrecourse loan should be treated as a true loan," 461 U.S. at 313, 103 S.Ct. at 1834, it emphasized that *Crane* was "predicated on the assumption that the mortgage will be repaid in full," *id.* 103 S.Ct. at 1836, and that "the original inclusion of the amount of the mortgage in basis rested on the assumption that the mortgagor incurred an obligation to repay." *Id.* This crucial assumption is lacking in our case. Since the value of the property failed to approach the amount of prior liens and the face amount of the nonrecourse obligations to RCA, taxpayers had no economic incentive to repay the obligations at issue here.

## IV.

In holding that taxpayers might claim deductions for depreciation, interest, taxes and expenses only to the extent of income derived from the property, the Tax Court made no determination of how the allowable amount was to be apportioned among these categories. A determination with respect to depreciation is essential because it affects the taxpayers' basis for a future transfer and possibly also the yearly com-

---

**4.** It is of some significance that in this case five of the taxpayers testified that they hoped to refinance their notes when the balloon payment came due on November 30, 1987. Thus, application of the symmetry rationale of *Tufts* might be postponed indefinitely.

**914**

putation of depreciation if anything other than a straight-line method is authorized and employed.

As a consequence, in affirming the decision of the Tax Court, we also remand the case for the Tax Court to determine how the allowable deduction should be apportioned among the interest, rental expenses, taxes and depreciation deductions.

AFFIRMED AND REMANDED.