**Jack C. CHILINGIRIAN; Joann E. Chilingirian, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 89–2313.

United States Court of Appeals, Sixth Circuit.

Submitted Aug. 13, 1990.

Decided Nov. 14, 1990.

**1252**

Francis G. Seyferth, Haddrill & Seyferth, Troy, Mich., for petitioners-appellants.

Peter K. Scott, I.R.S., Gary R. Allen, Acting Chief, Kimberly S. Stanley, Gilbert S. Rothenberg, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for respondent-appellee.

Before MARTIN and WELLFORD, Circuit Judges, and SILER, Chief District Judge.[*]

BOYCE F. MARTIN, Jr., Circuit Judge.

Jack and Joann Chilingirian appeal the tax court's decision of August 14, 1989, based on its opinion reported at T.C. Memo 1986–463, 52 T.C.M. (CCH) 606 (Sept. 22, 1986), holding them liable for deficiencies in their federal income taxes for tax years 1978, 1979 and 1980. We affirm.

The only real issue on appeal is how to treat unrealized gain from foreclosure sales for tax purposes.

In 1972, the Chilingirians, together with two partners, purchased a building known as the Crocker Professional Center in Mount Clemens, Michigan. In 1974, the Chilingirians bought out their partners in the Crocker Center and became the sole owners of the building. At that time, the Chilingirians obtained new financing for the property in the form of two mortgage notes. The first mortgage was with Fort Wayne Mortgage Company in the amount of $110,000. The second mortgage, which was for $60,000, was junior to the first mortgage and was obtained from Frank and Eunice Giambrone and Louis and Rose Davis, their original partners in the Crocker Center. The Chilingirians were personally liable on each of the mortgage notes.

The Chilingirians' initial basis in the Crocker Center was $147,800. As of June of 1978, their adjusted basis in the Crocker Center had been reduced to $124,275.

In June of 1978, the Chilingirians lost their interest in the Crocker Center through a non-judicial foreclosure. At that time, they were relieved of their personal liability on the two mortgage notes in the amount of $170,000. The Chilingirians divested themselves of their interest in the Crocker Center through transferring that interest by quitclaim deed to the holders of the second mortgage, who assumed liability for the first mortgage.

On February 1, 1975, the Chilingirians, together with Charles and Joanne Schwarz, purchased an office building and surrounding land known as the Medical Arts Plaza in Muskegon, Michigan. The Chilingirians and the Schwarzes entered into a mortgage agreement with American Savings Association for $480,000. An additional $150,000 mortgage on the property was entered into between the seller, R.A. Miller Industries, and Schwarz Enterprises. On September 8, 1975, the Schwarzes gave a quitclaim deed for their interest in the Medical Arts Plaza to the Chilingirians in exchange for $2,500 and again the Chilingirians were fully liable on the recourse notes.

During 1977, a judicial foreclosure was initiated by American Savings Association

---

[*] The Honorable Eugene E. Siler, Jr., Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

against the Medical Arts Plaza. The Chilingirians appealed the judgment of foreclosure to the Michigan Court of Appeals. Subsequently, there was a settlement. Under the terms of the settlement, the Chilingirians conveyed the Medical Arts Plaza by deed and paid an additional $10,000 to American Savings in exchange for relief from liability on the $480,000 mortgage note due to American Savings.

Subsequent to these transactions, an Internal Revenue agent conducted audits of two projects in which the Chilingirians were investors. The agent audited the Medical Arts Plaza for taxable years 1975 and 1976, and Courthouse Plaza, a third property, for taxable years 1976 and 1977. These audits were closed in January and March, 1979, respectively. In October of 1981, another Internal Revenue agent began auditing the Chilingirians' tax returns for taxable years 1977 through 1980. This audit was closed by December of 1982. The Chilingirians' tax returns for 1979 and 1980 had not been filed at the time the audit was begun and remained unfiled on May 14, 1984, when statutory notices of deficiency for 1978, 1979 and 1980 were mailed to the Chilingirians.

The statutory notices of deficiency determined deficiencies for those years based on the inclusion of gains from the foreclosure sales of the Crocker Center and the Medical Arts Plaza, and also determined additions to their tax liability for negligence, late filing, and failure to pay estimated tax. The Chilingirians timely filed a petition in the tax court contesting the Commissioner's determinations.

On September 22, 1986, the tax court held that the Chilingirians realized $170,000 on the nonjudicial foreclosure of the Crocker Center because they were relieved from personal liability on the two mortgage notes in the amount of $170,000. After subtracting their basis in the property of $124,275, the tax court found that the Chilingirians realized a gain of $45,725.

With regard to the foreclosure of the Medical Arts Plaza, the tax court determined that the Chilingirians' original basis in the property was $632,500, the total amount of both outstanding mortgages plus the $2,500 payment for the quitclaim deed. The tax court then held that the amount of gain realized by the Chilingirians was the difference between the amount of the mortgages discharged on the foreclosure and the Chilingirians' basis in the property after depreciation, plus the $10,000 deficiency judgment paid to American Savings.

The tax court sustained the Commissioner's determination of additions to tax for late filing and failure to file under § 6651(a) of the Internal Revenue Code, for negligence under § 6653(a), and for failure to pay estimated tax under § 6654. The tax court held that the Chilingirians had not shown that there was reasonable cause for their failure to timely file income tax returns for the years in issue. Similarly, the tax court found that the Chilingirians' failure to include the relief of their indebtedness in the amount realized on the foreclosure sales was not due to reasonable cause, and thus held them liable for the addition to tax for negligence. The tax court noted that Mr. Chilingirian was an attorney who dealt extensively with the Internal Revenue Service during the years in issue. Finally, the tax court held that because none of the statutory exceptions had been shown to be applicable, an addition to tax was mandatory for failure to pay estimated tax.

Following the tax court's September 22, 1986 opinion, the Chilingirians contested the Commissioner's computation for entry of decision pursuant to Tax Ct. R. 155. The Chilingirians also sought to reopen the record, asserting that their tax liability should be computed using the income-averaging method. The parties subsequently settled the Rule 155 computation dispute, and the tax court denied the Chilingirians' right to raise the income-averaging issue in a Rule 155 proceeding because that issue had not been raised below. From those decisions, the Chilingirians appeal to this Court.

The Chilingirians' primary contention on this appeal is that no gain should be recognized on the foreclosure of property where

the owner of the property is personally liable on the mortgage and any equity in the property is lost. Though they acknowledge the long-standing case authority holding that nonrecourse liabilities which are discharged are included in the amount realized on the disposition of property, the Chilingirians contend that there should be a different result in this case because they were personally liable for the mortgages, and thus recourse loans were at issue, and because the loans were discharged pursuant to foreclosure. We find this argument meritless.

■ Section 1001 of the Internal Revenue Code governs the determination of gains and losses on the disposition of property. The gain or loss from the sale or other disposition of property is defined as the difference between "the amount realized" on the disposition and the property's adjusted basis. I.R.C. § 1001(a) (1986). It has long been established that the "amount realized" from a disposition of property includes the amount of liabilities from which the transferor is discharged as a result of such disposition. *Crane v. Commissioner,* 331 U.S. 1, 14, 67 S.Ct. 1047, 1054, 91 L.Ed. 1301 (1947). Treas.Reg. § 1.1001–2(a)(1) (1980). This rule applies regardless of whether the debt is recourse or nonrecourse, *i.e.,* regardless of whether the taxpayer is personally liable for the debt. *Commissioner v. Tufts,* 461 U.S. 300, 308–09, 103 S.Ct. 1826, 1831–32, 75 L.Ed.2d 863 (1983); *Crane,* 331 U.S. at 13–14, 67 S.Ct. at 1054–55; *Yarbro v. Commissioner,* 737 F.2d 479, 484 (5th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985) ("in computing the amount of gain on the disposition, the outstanding debt must be included in the 'amount realized' by the taxpayer whether the debt is recourse or non-recourse").

■ The Chilingirians contend that *Crane* does not address their situation and claim that "there is something paradoxical about charging a property owner with gain when he loses his property in foreclosure and receives no money or other tangible property therefore." The Chilingirians' argument ignores the large depreciation deductions they were taking on the property during their period of ownership.

The reason for the *Crane* rule is that because the total liability is considered in determining the tax basis for the property, the total liability must also be included in the "amount realized" when the property is transferred. *Tufts,* 461 U.S. at 313, 103 S.Ct. at 1834. "Unless the outstanding amount of the mortgage is deemed to be realized, the mortgagor effectively will have received untaxed income at the time the loan was extended and will have received an unwarranted increase in the basis of his property." *Id.* at 310, 103 S.Ct. at 1832. Where depreciation deductions have been taken, as in this case, the reason for the rule is even more pronounced because it recognizes that such deductions are an economic benefit to the taxpayer. *See Crane,* 331 U.S. at 15–16, 67 S.Ct. at 1055–56. It is clear that the rationale for the rule does not depend on whether the outstanding loan is recourse or non-recourse. We, therefore, conclude that the tax court properly determined that the Chilingirians were required to recognize as gain the difference between the amount they realized, the total amount of the outstanding mortgages less their adjusted basis in the property.

■ The Chilingirians also appeal the tax court's imposition of additions to tax for negligence and for failure to file timely returns for 1978, 1979 and 1980. They contend, without reason or evidentiary support, that their failure to file returns was due to reasonable cause because the two Internal Revenue agents who were auditing them advised them not to file until the audits were completed.

Section 6651 imposes a penalty on taxpayers who fail to file the required federal tax returns by the required date "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." I.R.C. § 6651(a)(1) (1986). Whether there is "reasonable cause" is a question of fact which in our opinion is "peculiarly within the province of the Tax Court." *Lee v. Commissioner,* 227 F.2d 181, 184 (5th Cir. 1955), *cert. denied,* 351 U.S. 982, 76 S.Ct.

1048, 100 L.Ed. 1497 (1956). The burden is on the taxpayer to prove that the failure to file on time was due to reasonable cause. *Estate of Geraci v. Commissioner*, 502 F.2d 1148, 1149 (6th Cir.1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975). "Absent such a showing by the taxpayer, imposition of the addition is mandatory." *Id.*

The evidence in the case before the tax court establishes that the first agent finished his audit before the Chilingirians' 1978 return was due and thus had no reason to advise them to delay filing. In addition, by the time the second agent began his audit, the Chilingirians were already liable for the late filing penalty because their 1979 return was more than five months late and their 1980 return was more than three months late. The tax court, therefore, properly found that the Chilingirians lacked reasonable cause for untimely filing their returns. In addition, because the Chilingirians failed to present any evidence showing that their underreporting of income was not due to negligence, the tax court's imposition of the negligence penalty under § 6653(a) was also appropriate.

Finally, the Chilingirians contend that the tax court abused its discretion in denying their request to use the income-averaging method when their tax liability was determined at a post-trial proceeding. A tax court, after rendering its opinion determining the issues in a case, may withhold entry of its decision to allow the parties to submit computations pursuant to the court's determination of the issues. Tax Ct. R. 155(a). If the parties disagree as to the amount of the deficiency, the tax court may hear arguments at a post-trial proceeding. Tax Ct. R. 155(b). A party is explicitly precluded, however, from raising a new issue during such a proceeding. Tax Ct. R. 155(c); *See Paccar, Inc. v. Commissioner*, 849 F.2d 393, 399 (9th Cir.1988).

Income averaging constitutes a "new issue" if not raised by a party before the Rule 155 proceeding, and thus may not be raised in the Rule 155 proceeding. *Molasky v. Commissioner*, 897 F.2d 334, 338

(8th Cir.1990). The Chilingirians failed to raise the issue of income averaging in their pleadings or at trial. As in *Molasky*, the issue was not raised until the Rule 155 proceeding, more than 18 months after the tax court entered its opinion. Under these circumstances, the tax court did not abuse its discretion in prohibiting consideration of income averaging during the Rule 155 proceeding. *See Molasky*, 897 F.2d at 338.

Accordingly, the judgment of the tax court is affirmed.