T.C. Memo. 2001-151


UNITED STATES TAX COURT


INTERHOTEL COMPANY, LTD., TORREY HOTEL ENTERPRISES, INC., TAX
MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket No. 13017-95.                    Filed June 22, 2001.


    M and THEI were partners in IHCL, a limited
partnership formed in 1981 to hold interests in Landmark
and Gateway, two limited partnerships. Landmark and
Gateway were formed to construct, own, and manage
separate hotel towers of a San Diego resort complex.
Landmark and Gateway financed their hotel developments
using nonrecourse debt.

    The IHCL partnership agreement provided that upon
liquidation, the proceeds would be distributed only to
those partners having positive capital accounts. The
partnership agreement did not require the partners to

_____

    [*]    This Memorandum Opinion supplements our Opinion in
Interhotel Co., Ltd. v. Commissioner, T.C. Memo. 1997-449 (1997),
vacated and remanded without published opinion 221 F.3d 1348 (9th
Cir. 2000).

restore any deficits in their capital accounts upon liquidation of the partnership.

In 1985, D agreed to invest $19.8 million in IHCL in exchange for a 15-percent interest in IHCL. D received a non-pro rata (special) allocation of 99 percent of IHCL's income and losses. Upon D's entry as a partner in IHCL, M withdrew as a partner, and THEI's interest in IHCL was reduced.

D encountered financial difficulties and defaulted on its contribution payment obligation. In 1987, the special allocation of IHCL's gains and losses to D was terminated. Thereafter, the gains and losses of IHCL were allocated to THEI and D pro rata in accordance with their respective partnership interests. Under this new allocation, 85 percent of the losses went to THEI, creating a substantial deficit balance in THEI's partnership capital account.

On June 20, 1991, M purchased D's interest in IHCL and thereafter succeeded to D's then-positive $14.8 million partnership capital account. At the time, THEI had a negative $5.9 million partnership capital account balance.

Upon M's reentry into IHCL, the IHCL partnership agreement was amended to provide that IHCL's income would be allocated first to partners having negative capital account balances and thereafter to the partners pro rata.

IHCL's 1991 information return reported an allocation of 99 percent of IHCL's income to D through June 20, 1991, and thereafter an allocation of 100 percent of the income to THEI. Respondent determined that 99 percent of IHCL's income after June 20, 1991, should be allocated to M.

In our original opinion in this case, we sustained respondent's position. On appeal, the parties agreed that a minimum gain chargeback should be included in the Court's calculations for purposes of the comparative liquidation test of the partners' interests under sec. 1.704-1(b)(3)(iii), Income Tax Regs.

**Held**: In view of the parties' agreement, the special allocation of 100 percent of IHCL's income earned after June 20, 1991, to THEI is in accordance with the partners' interests in IHCL and is therefore respected. See sec. 704(b).

Kenneth W. Gideon, for petitioner.

Gretchen A. Kindel, for respondent.

SUPPLEMENTAL MEMORANDUM OPINION

JACOBS, Judge: This case is before us on remand from the Court of Appeals for the Ninth Circuit. See Interhotel Co., Ltd. v. Commissioner, 221 F.3d 1348 (9th Cir. 2000), vacating and remanding without published opinion T.C. Memo. 1997-449. Torrey Hotel Enterprises, Inc. (THEI), is a California corporation organized and controlled by Douglas F. Manchester (Mr. Manchester). THEI is the tax matters partner of Interhotel Company, Ltd. (IHCL), a California limited partnership. Mr. Manchester is the other partner in IHCL.

Respondent issued a notice of final partnership administrative adjustment (FPAA) on April 11, 1995. In relevant part,[1] respondent

---

[1] In addition to the amounts at issue, respondent determined that Interhotel Co., Ltd. (the partnership whose earnings are at issue here), had ordinary income from its business activities in the amount of $404,950, rather than $355,745, as reported on its Form 1065, U.S. Partnership Return of Income, for 1991. Respondent further determined that the partnership was entitled to "Other Deductions, Professional Fees"

(continued...)

proposed increasing Mr. Manchester's reported distributive share of IHCL's net income for 1991 by $814,296. As a consequence of this determination, respondent determined that Mr. Manchester should be subject to adjustments for alternative minimum tax and tax preference items totaling $23,490. The issue for decision on remand is whether the allocation of all of IHCL's income to THEI possessed economic substance or was made in accordance with the partners' interests in IHCL.

## Background

We incorporate herein the findings of fact set forth in Interhotel Co., Ltd. v. Commissioner, T.C. Memo. 1997-449 (Interhotel Co. I) by this reference. For convenience, we shall summarize the relevant facts in Interhotel Co. I. We also incorporate herein the stipulations and exhibits in Interhotel Co. I by this reference.

Unless indicated otherwise, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Prior to 1985, Mr. Manchester formed two limited partnerships, Pacific Landmark Hotel, Ltd. (Landmark), and Pacific Gateway, Ltd. (Gateway), to construct, own, and manage two hotel facilities at the San Diego convention center. The two partnerships financed the

---

[1](...continued)
in the amount of $2,228, instead of $51,433, as reported. The parties resolved these issues prior to trial.

construction of the hotels principally through the use of nonrecourse borrowing. For tax purposes, Landmark and Gateway utilized accelerated depreciation methods. These methods reduced the partnerships' tax bases in the hotel properties to amounts that were less than the amount of debts the partnerships had incurred to construct those properties.

Mr. Manchester formed IHCL to hold 35.354-percent limited partnership interests in Landmark and Gateway. Under the Agreement of Limited Partnership of IHCL, dated October 3, 1985 (the IHCL Original Agreement), Mr. Manchester held a .001-percent interest in IHCL. THEI held a 99.999-percent interest, both as a general and limited partner.

In November 1985, Dondi Properties (Dondi), which was then controlled by Vernon Savings and Loan Association (Vernon), invested in IHCL. Dondi received a 15-percent limited partnership interest in IHCL in exchange for its agreement to contribute $19.8 million to IHCL. Mr. Manchester then withdrew as a partner in IHCL. Following this transaction, THEI held an 85-percent interest in IHCL (an 84-percent limited partnership interest and a 1-percent interest as the general partner).

Dondi's entry into IHCL was reflected in a "Restated and Amended Agreement of Limited Partnership of IHCL", dated November 29, 1985 (the IHCL Restated Agreement). That agreement allocated 99 percent of IHCL's net losses to Dondi, and 1 percent to THEI as

the general partner. The IHCL Restated Agreement further provided that after approximately 5 years, the net losses were to be allocated to the partners on a pro rata basis. Pursuant to the IHCL Restated Agreement, IHCL's net income was allocated to the partners in the same ratio as net losses until such time as the allocated amount of income equaled the amount of IHCL's cumulative net losses; thereafter, IHCL's income would be allocated to the partners pro rata.

Moreover, as part of Dondi's entry into IHCL, the limited partnership agreements of Landmark and Gateway were amended to allocate 90.91 percent of Landmark's and Gateway's net losses to IHCL.

IHCL maintained capital accounts for each of its partners. The partnership agreements of IHCL, Landmark, and Gateway all required that upon liquidation distributions to partners would be made in accordance with the partners' positive capital account balances.

By January 1986, Dondi had contributed $10.8 million of the required $19.8 million to IHCL and agreed to pay the balance due ($9 million) in subsequent quarterly installments. Dondi encountered financial difficulties and failed to make the installment payment due January 6, 1987. (By that time, the Federal Deposit Insurance Corporation (FDIC) had become the receiver for Vernon.) As a result, in April 1987, THEI gave Dondi

written notice, under section 4.3.4.2(d) of the IHCL Restated Agreement, that Dondi's 99-percent allocation of IHCL's net losses was terminated. Pursuant to the IHCL Restated Agreement, IHCL's net losses were then allocated to the partners pro rata in accordance with the 85:15 ratio reflecting the two partners' interests. As a consequence, 15 percent of the losses were allocated to Dondi and 85 percent of the losses were allocated to THEI. The special allocation of IHCL's net income remained unchanged, and IHCL's Restated Agreement continued to allocate 99 percent of its net income to Dondi.

In October of 1987, the Marriott Corp. (Marriott) obtained a 5-percent general partnership interest in both Landmark and Gateway. Marriott also received an allocation of 95 percent of Landmark's net losses and 99 percent of Gateway's net losses. These allocations reduced the amount of losses Landmark and Gateway previously allocated to IHCL.

By the end of 1990, THEI's capital account in IHCL was a negative $5,920,614; principally, this was the result of the losses generated between Dondi's April 1987 default, and the reallocation of losses to Marriott 6 months later. In contrast, by the end of 1990, Dondi's capital account in IHCL grew to $14,879,392.

IHCL's balance sheet as of the end of 1990 revealed the following:

| | |
|---|---|
| Cash | $7,955,796 |
| Unamortized Organization costs | 39,388 |
| Investment in Pacific Gateway | 2,328,218 |
| Investment in Pacific Landmark | (1,358,431) |
| Liabilities | (6,193) |
| Subtotal | 8,958,778 |

On June 20, 1991, Dondi transferred its 15-percent limited partnership interest in IHCL to the FDIC, as receiver for Vernon. The FDIC transferred this interest in IHCL to Mr. Manchester in exchange for his $5 million payment. As a result, THEI held a 1-percent interest as general partner and an 84-percent interest as a limited partner. Mr. Manchester, as Dondi's successor, held the remaining 15-percent limited partnership interest and succeeded to Dondi's capital account.

On June 21, 1991, the parties executed a second amendment to the IHCL Restated Agreement. The second amendment provided that IHCL's net income would be allocated first to the partners who had negative capital account balances and, thereafter, to the partners pro rata.

At the end of 1991, the balance sheet of IHCL set forth its book value as follows:

| | |
|---|---|
| Cash | $9,098,388 |
| Unamortized organization costs | 39,388 |
| Note receivable from THEI | 2,619,833 |
| Investment in Pacific Gateway | 2,660,677 |
| Investment in Pacific Landmark | (3,967,304) |
| Liabilities | (1,847) |
| Subtotal | 10,449,135 |

IHCL filed a 1991 information return (Partnership Return of Income) reporting the allocation of 99 percent of its net income to

Dondi through June 20, 1991, the date Dondi's interest was transferred to Mr. Manchester. The 1991 return further reflected that, after June 20, 1991, 100 percent of IHCL's net income was allocated to THEI.

Respondent challenged the allocation of 100 percent of IHCL's net income to THEI; respondent determined that for the period after June 20, 1991, Mr. Manchester should be allocated a portion of IHCL's net income. Specifically, respondent determined that Mr. Manchester's distributive share of IHCL's net income should be increased by $814,296 and that his share of tax preference items should be increased by $23,490. This reallocation of IHCL's net income reflects the pre-June 20, 1991, allocation of income and losses to Dondi: 1 percent to THEI and 99 percent to Mr. Manchester, as Dondi's successor. The FPAA stated that "the adjustments in the distributive shares are determined in accordance with the partners' interest in the partnership as the partnership has not shown that the allocation per the return is an allowable allocation under the provisions of the Internal Revenue Code."

In Interhotel Co. I, we held that the allocation of 100 percent of IHCL's net income for 1991 to THEI lacked substantial economic effect and was inconsistent with the partners' interests in the partnership. Accordingly, we sustained respondent's reallocation of the majority of that income to Mr. Manchester. On

appeal of our decision, the Court of Appeals for the Ninth Circuit stated:

> The Internal Revenue Service concedes that it erred in convincing the Tax Court to refrain from including a minimum gain chargeback in the court's calculations for purposes of the comparative liquidation test. Because of this concession, we VACATE the Tax Court's decision and REMAND for further proceedings, findings, and conclusions.

## Discussion

Section 704(a) provides the framework for the determination of a partner's distributive share of partnership income, gain, loss, deductions, or credits of the partnership. In general, the partnership agreement determines a partner's distributive share of these items. See sec. 704(a). However, the partners' ability to allocate partnership items on a basis other than in accordance with the partners' interest in the partnership (i.e., non-pro rata basis) is not unrestricted. The allocation of partnership items on a non-pro rata basis (hereinafter referred to as a "special allocation") either (1) must have substantial economic effect (as opposed to the mere avoidance of tax), or if the allocation does not have substantial economic effect, then (2) the partner's distributive share of partnership items "shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances)". Sec. 704(b). The regulations under section 704(b) describe in detail not only the circumstances in which a special allocation

will have "substantial economic effect" but also the manner of determining a partner's "interest in the partnership".

Substantial Economic Effect

The regulations provide that a special allocation of partnership items is deemed to have substantial economic effect, if, in the event there is an economic benefit or burden that corresponds to an allocation, the partner to whom the special allocation is made receives a corresponding benefit or bears a corresponding burden. See sec. 1.704-1(b)(2)(ii), Income Tax Regs. Moreover, the economic effect of the special allocation must be substantial; this requires "a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences." Sec. 1.704-1(b)(2)(iii)($\underline{a}$), Income Tax Regs.

Determinations of substantial economic effect, as well as determinations of a partner's interest in the partnership, depend upon an analysis of the partners' capital accounts. Generally speaking, a partner's capital account represents the partner's equity investment in the partnership. The capital account balance is determined by adding (1) the amount of money that the partner contributes to the partnership, (2) the fair market value of property the partner contributes (net of liabilities to which the property is subject or which are assumed by the partnership), and

(3) any allocation of partnership income or gain.  A partner's capital account is decreased by the amount of partnership losses and deductions allocated to such partner.   The capital account is further reduced by the fair market value of property distributed to the partner, net of any liability that the partner assumes or to which the property is subject.  See sec. 1.704-1(b)(2)(iv), Income Tax Regs.

The regulations governing the economic effect of special allocations contain three tests that essentially serve as "safe harbors".  Special allocations are deemed to have economic effect if they meet the requirements of any one of these safe harbor tests.

(1)  The Basic Test of Economic Effect

The basic test for economic effect (with respect to special allocations) is set forth in section 1.704-1(b)(2)(ii)(b), Income Tax Regs.  The test provides, in general, that a special allocation will have economic effect if the partnership agreement contains provisions that require:  (1) The determination and maintenance of partners' capital accounts be in accordance with the rules of section 1.704-1(b)(2)(iv), Income Tax Regs.; (2) upon liquidation of the partnership, the proceeds of liquidation be distributed in accordance with the partners' positive capital account balances; and (3) upon liquidation of the partnership, all deficit capital accounts be restored to zero.

With regard to the matter before us, the parties agree that the IHCL Restated Agreement complies with the first two requirements. (The agreement provides that the partners' capital accounts will be properly maintained and that liquidation proceeds will be distributed to the partners in proportion to their positive capital account balances.) However, neither the IHCL Restated Agreement, nor any of its amendments, require partners having deficit capital account balances to restore the deficits to zero upon liquidation of the partnership. Accordingly, the special allocation of 100 percent of IHCL's net income for 1991 to THEI did not meet all the requirements necessary to satisfy the basic test of substantial economic effect.

### (2) Alternative Test of Economic Effect

Limited partnership agreements (such as the IHCL Original Agreement) usually provide specific limits upon the amount the limited partners are required to contribute to the partnership. These limits on liability, however, are inconsistent with the requirement in the basic test that upon liquidation each partner must agree to repay the deficit balance in that partner's capital account. Consequently, an alternative test for economic effect has been developed to provide that special allocations of partnership items may have economic effect even in the absence of an unlimited deficit restoration requirement.

The alternative test begins by incorporating the first two parts of the basic test. (As with the basic test, the partnership agreement must provide for properly maintained capital accounts. It must also provide that the proceeds of liquidation are to be distributed in accordance with the partners' positive capital account balances.) However, instead of a negative capital account makeup requirement, the alternative test mandates a hypothetical reduction of the partners' capital accounts. Specifically, the alternative test requires that capital accounts be reduced for any distributions that, as of the end of the year, are reasonably expected to be made, to the extent that such distributions exceed reasonably expected increases to the partners' capital accounts. See sec. 1.704-1(b)(2)(ii)(d), Income Tax Regs. By requiring a prospective reduction of capital accounts, the alternative test serves to preclude a limited partner from timing the receipt of deductible partnership expenses in a way that permits a partner to accumulate a negative capital account that the partner need not repay.

The alternative test also requires that the partnership agreement provide for a "qualified income offset" (QIO). A QIO provision automatically allocates income, including gross income and gain, to a limited partner who has an unexpected negative capital account, either as a result of partnership operations or as a result of making the adjustment for reasonably expected

reductions. The QIO must operate "in an amount and manner sufficient to eliminate such deficit balance as quickly as possible." Sec. 1.704-1(b)(2)(ii)(d), Income Tax Regs. (flush language).

In the present matter, neither the IHCL Original Agreement nor the IHCL Restated Agreement contains a provision requiring capital account adjustments for reasonably expected distributions or a "qualified income offset". Although the second amendment to the IHCL Restated Agreement does provide for a net income allocation to pay off THEI's deficit capital account, the second amendment falls short of providing a QIO. Rather, the second amendment allocates only net income, not "a pro rata portion of each item of partnership income" allocated "in an amount and manner sufficient to eliminate such deficit balance as quickly as possible." Sec. 1.704-1(b)(2)(ii)(d), Income Tax Regs. Consequently, the IHCL special allocation does not meet the alternative test of economic effect.

### (3) Economic Equivalence Test

There is a third economic effect "safe harbor", referred to as the "economic equivalence test". Section 1.704-1(b)(2)(ii)(i), Income Tax Regs., provides that, in the event that an allocation would produce the economic equivalent of meeting the basic test for

economic effect, it will be deemed to have economic effect even if it does not otherwise meet the formal requirements of the basic test.

In the present case, neither party maintains that the special allocations in this complex multitiered partnership situation would have the equivalent economic effect of meeting the basic test.

### (4)  Conclusion

The special allocation of 100 percent of IHCL's net income for 1991 to THEI does not have substantial economic effect.

## Partners' Interests in the Partnership

### (1)  The General Rule

Section 704(b) provides that an allocation of partnership income, gain, loss, deductions, or credit (or item thereof) that does not meet the requirements for substantial economic effect will be "determined in accordance with the partner's interest in the partnership".  This requirement, although less specific than the test for economic effect, nevertheless requires that partnership allocations be analyzed on the basis of their actual economic impact.  Accordingly, the regulations provide that an examination of a partner's interest in the partnership "shall be made by taking into account all facts and circumstances relating to the economic arrangement of the partners."  Sec. 1.704-1(b)(3)(i), Income Tax Regs.

(2) The Comparative Liquidation Test

Pursuant to section 1.704-1(b)(3)(iii), Income Tax Regs., a partner's interest in the partnership is determined by the "comparative liquidation test". When a partner's special allocation is consistent with the comparative liquidation test, the special allocation is deemed to be in accordance with the partners' interests in the partnership. This test applies only when a partnership's special allocations lack economic effect under the alternative test for economic substance set forth in section 1.704-1(b)(2)(ii), Income Tax Regs.

To satisfy the comparative liquidation test, the partnership agreement must meet the first two parts of the basic test for economic effect. That is, the partnership agreement must provide that (1) capital accounts are to be properly maintained, and (2) liquidating distributions will be made only to partners with positive capital account balances. When both conditions are satisfied, a partner's interest is measured by comparing the amount the partner would receive in a hypothetical liquidation at the end of the current year with the amount the partner would have received in a hypothetical liquidation at the end of the prior year. Specifically:

> the partner's interests in the partnership with respect to the portion of the allocation that lacks economic effect will be determined by comparing the manner in which distributions (and contributions) would be made if all partnership property were sold at book value and the partnership were liquidated immediately following the end

of the taxable year to which the allocation relates with the manner in which distributions (and contributions) would be made if all partnership property were sold at book value and the partnership were liquidated immediately following the end of the prior taxable year * * *.   A determination made under this paragraph (b)(3)(iii) will have no force if the economic effect of valid allocations made in the same manner is insubstantial under paragraph (b)(2)(iii) of this section. * * * [Sec. 1.704-1(b)(3)(iii), Income Tax Regs.]

Both parties rely on the comparative liquidation test to show their differing schemes.

Respondent asserts that the comparative liquidation test of section 1.704-1(b)(3)(iii), Income Tax Regs., supports the special allocation of all partnership income to Mr. Manchester, as set forth in the FPAA.   First, respondent contends that if all of IHCL's assets had been sold at the end of 1990, the net liquidation proceeds would have been $8,958,778.   Respondent computes this amount, using stipulated figures, as follows:

Assets

| | | |
|---|---|---|
| Cash | $7,955,796 | |
| Investment in Landmark | (1,358,431) | |
| Investment in Gateway | 2,328,218 | |
| Unamortized organization costs | [1]39,388 | |
| Total assets | | 8,964,971 |

Liabilities

| | | |
|---|---|---|
| Accounts payable | (6,193) | |
| Total liabilities | | (6,193) |
| Net Proceeds | | 8,958,778 |

[1] Respondent eliminated the unamortized organization costs; thus, respondent's figures for total assets and net proceeds are $39,388 less than indicated above. Without passing on the correctness of this omission, we have included these costs in order to make respondent's and petitioner's figures more easily comparable.

Next, respondent contends that if all of IHCL's assets had been sold at the end of 1991, the proceeds therefrom would be $10,449,135. This amount is computed as follows:

<u>Assets</u>

| | | |
|---|---|---|
| Cash | $9,098,388 | |
| Investment in Landmark | (3,967,304) | |
| Investment in Gateway | 2,660,677 | |
| Note receivable from THEI | 2,619,833 | |
| Unamortized organization costs | 39,388 | |
| Total assets | | 10,450,982 |

<u>Liabilities</u>

| | | |
|---|---|---|
| Accounts payable | (1,847) | |
| Total liabilities | | (1,847) |
| Net proceeds | | 10,449,135 |

Respondent asserts that, at the end of the first year (1990) all the liquidation proceeds would have gone to Dondi, which was the only partner to have a positive capital account. Further, respondent claims the amount available for distribution upon liquidation is $5,960,002 less than the positive capital account balance of $14,879,392 for Dondi.

At the end of the next year (1991, the year involved herein), the net book value of IHCL's assets was $10,449,135. Respondent contends that under the IHCL Restated Agreement, all of the increase in book value would have been distributed to Mr.

Manchester, as successor to Dondi's interest in IHCL, because Mr. Manchester was the only partner with a positive capital account at the end of 1991. Respondent points out that the amount available for distribution is approximately $5 million less than the positive balance in Mr. Manchester's capital account.

Respondent concludes that the application of the comparative liquidation test supports the determination made in the FPAA--i.e., that because at the end of 1991 Mr. Manchester was the only partner having a positive capital account in IHCL, he would be the only partner eligible to receive IHCL's liquidation proceeds; accordingly, all the post-June 20, 1991, income of IHCL must be allocated to him.

Nonrecourse Debt Deductions

Petitioner disagrees with respondent's conclusion. Petitioner contends that respondent erroneously failed to include in the deemed liquidation proceeds approximately $7 million (relating to deductions that were based upon nonrecourse debt) for both 1990 and 1991. A brief discussion relating to tax principles involving the calculation of the basis of property acquired through nonrecourse debt financing and the calculation of gain required to be realized from the disposition of such property is deemed beneficial in understanding petitioner's position.

In a nonrecourse debt financing situation, the lender agrees that it will not maintain a collection action directly against the

debtor. Rather, should the debtor default, the lender's only recourse is the institution of foreclosure proceedings with respect to the property securing the debt. Accordingly, if the value of the property securing the debt falls below the amount of the debt, it is the lender, not the debtor, who bears the risk of loss. Nevertheless, it is well settled that for tax purposes, nonrecourse debt incurred to acquire property constitutes a part of the debtor's cost basis in the property it has purchased. See Crane v. Commissioner, 331 U.S. 1, 14 (1947). Accordingly, the amount of debt (even nonrecourse debt) increases the amount the debtor/taxpayer may claim for depreciation with respect to encumbered property. However, when the debtor disposes of the property, the debtor must include in the amount realized from the disposition of the property the amount of any remaining nonrecourse debt to which the property is subject. Thus, if the debtor has taken deductions (such as depreciation deductions) that have reduced its basis in the property to an amount less than the amount of the nonrecourse debt, the debtor must recognize gain at least to the extent that its basis is exceeded by the amount of debt secured by the property. See Commissioner v. Tufts, 461 U.S. 300, 307 (1983).

## Minimum Gain and Minimum Gain Chargebacks

The aforementioned nonrecourse debt principles apply to partnerships. If a partnership has acquired properties with

nonrecourse debt, the partnership's deduction of expenses associated with these properties--such as expenses for depreciation--may lead to a situation where the amount of nonrecourse debt exceeds the partnership's basis in the properties securing that debt. These deductions--called "nonrecourse deductions"--per se do not have economic effect because the lender (and not the partnership or its partners) bears the economic risk of loss with respect to the nonrecourse deductions.

As applicable to 1991 (the taxable year at issue), temporary regulations exist that govern the allocation of deductions attributable to nonrecourse debt. These provisions are set forth in section 1.704-1T(b)(4) and (5), Temporary Income Tax Regs., 53 Fed. Reg. 53161-53173 (Dec. 30, 1988), and involve the concepts of "minimum gain" and "minimum gain chargebacks". These provisions represent the application of the Tufts principle in a partnership context.

"Minimum gain" is created when a partnership claims deductions that decrease the partnership's basis in a given property to an amount less than the balance of the nonrecourse debt incurred in the acquisition of that property.

The event that triggers a "minimum gain chargeback" is one which causes a decrease in partnership minimum gain. A triggering event therefore occurs when a partnership disposes of property in respect of which the partnership's nonrecourse indebtedness exceeds

the partnership's basis. It is this type of event that, under Tufts, triggers the realization of gain by the partnership (at least to the extent the amount of the partnership's acquisition indebtedness exceeds the partnership's basis in that property). To illustrate, assume that a partnership owed $1 million in nonrecourse debt that it used to acquire depreciable property. If the partnership claimed $200,000 in depreciation deductions (which would lower its $1 million basis in the property to $800,000), the $200,000 (the amount by which the debt exceeds the partnership's basis) would be the "minimum gain". This $200,000 is the potential gain (sometimes called "phantom gain"[2]) that the partnership would realize when it disposes of that property. Thus, if the lender foreclosed upon the property, the partnership would realize at least a minimum gain of $200,000, even though the partnership received no gain in an economic sense.

The $200,000 "minimum gain chargeback" is the minimum gain that is allocated to the partners who had claimed (as pass throughs) the nonrecourse deductions. These allocations of minimum

---

[2] See Nadler v. Commissioner, T.C. Memo. 1992-383 (quoting Westin, The Tax Lexicon 413 (1989)), affd. without published opinion 993 F.2d 1533 (2d Cir. 1993).

gain increase the partners' capital accounts[3] as well as expose the partners to income taxation on the amount of gain.

Minimum Gain and the Comparative Liquidation Test

Petitioner maintains that the minimum gain chargeback provisions required IHCL to realize approximately $7 million in minimum gain chargebacks with respect to the comparative liquidation test. Petitioner's position is based on the following theory: although IHCL owned no property subject to nonrecourse debt, it had ownership interests in Landmark and Gateway, both of

---

[3] Specifically, sec. 1.704-1T(b)(4)(iv)(e), Temporary Income Tax Regs., 53 Fed. Reg. 53163 (Dec. 30, 1988), provides:

(e) Minimum gain chargeback--(1) In general. If there is a net decrease in partnership minimum gain for a partnership taxable year, the partners must be allocated items of partnership income and gain in accordance with this paragraph (b)(4)(iv)(e) ("minimum gain chargeback").

(2) Allocations required pursuant to minimum gain chargeback. If a minimum gain chargeback is required for a partnership taxable year, then each partner must be allocated items of income and gain for such year (and, if necessary, for subsequent years) in proportion to, and to the extent of, an amount equal to the greater of--

(i) The portion of such partner's share of the net decrease in partnership minimum gain during such year that is allocable to the disposition of partnership property subject to one or more nonrecourse liabilities of the partnership; or

(ii) The deficit balance in such partner's capital account at the end of such year * * *

which did own such properties.  IHCL's ownership of interests in these lower tier partnerships is, in effect, a proportionate ownership interest in the properties of those lower tier partnerships as well.  In this regard, petitioner points to the regulations governing allocation of nonrecourse deductions, which expressly provide a "look-through" rule for situations involving tiered partnerships.  Petitioner then posits that for purposes of the nonrecourse deductions, the "look-through" rule is designed to produce the same consequences for the upper tier partnership (here, IHCL) that would have resulted had IHCL directly held its proportionate share of the properties owned by Gateway and Landmark.  Petitioner concludes that under these regulations, had Landmark or Gateway incurred minimum gains on the disposition of their property, IHCL would be required to realize its proportionate share of those gains.  See sec. 1.704-1T(b)(4)(iv)(j), Temporary Income Tax Regs., 53 Fed. Reg. 53166 (Dec. 30, 1988).

Continuing, petitioner asserts that a deemed liquidation of IHCL under the comparative liquidation test would imply a deemed liquidation of Landmark and Gateway as well, and hence, a sale of their hotel properties.  The result of the disposition of those properties would trigger minimum gain chargebacks to Landmark and Gateway, and through them, a proportionate share to IHCL.

Petitioner's application of the comparative liquidation test uses the same figures as respondent.  However, petitioner augments

those figures with substantial amounts of minimum gain chargebacks for both 1990 and 1991.  As a first step, petitioner contends that if all of IHCL's assets had been liquidated at the end of 1990--the year prior to the taxable year--the net liquidation proceeds would have been $16,328,755.  This amount is computed as follows:

Assets

| | |
|---|---|
| Cash | $7,955,796 |
| Unamortized organization costs | 39,388 |
| Investment in Pacific Gateway | 2,328,218 |
| Investment in Pacific Landmark | (1,358,431) |
| Liabilities | (6,193) |
|    Subtotal | 8,958,778 |
| | |
| 1990 Minimum gain chargeback | 7,369,977 |
| | |
| Distributable liquidation proceeds at book value 1/1/91 | 16,328,755 |

Petitioner contends that $5,920,614 of the minimum gain chargeback would be used first to eliminate THEI's negative capital account.  The $1,449,353 balance of the minimum gain chargeback would then be allocated pursuant to the IHCL Restated Agreement as it was in effect during 1990.  Thus, 85 percent (or $1,231,959) would be allocated to THEI and 15 percent (or $217,404) would be allocated to Dondi.  These allocations, when added to the partners' capital accounts, yield a positive capital account of $1,231,959 for THEI and $15,096,769 for Dondi.  Together, they reflect total partnership capital of $16,328,755--the amount of the previously identified liquidation proceeds.

As a second step, petitioner maintains that a liquidation of all of IHCL's assets at the end of 1991--the taxable year--would yield proceeds of $17,887,056. This amount is computed as follows:

12/31/91 Deemed Liquidation

| | |
|---|---|
| Cash | $9,098,388 |
| Organization costs | 39,388 |
| Note receivable from THEI | 2,619,833 |
| Investment in Pacific Gateway | 2,660,677 |
| Investment in Pacific Landmark | (3,967,304) |
| Liabilities | (     1,847) |
| Subtotal | 10,449,135 |
| | |
| 1991 Minimum gain chargeback | 7,437,891 |
| | |
| Distributable liquidation proceeds at book value 12-31-91 | 17,887,026 |

This $17,887,026 amount is $1,558,301 more than that for 1990, the prior year. This increase consists of an additional $67,914 in minimum gain chargebacks generated during 1991, plus partnership income for 1991 of $1,490,387. The total minimum gain would first be used to eliminate THEI's negative capital account of $5,920,614. The balance of $1,517,277 would be distributed  in accordance with the partnership agreement--that is, 99 percent to Dondi  and 1 percent to THEI until June 20, 1991, when 100 percent would be allocated to THEI.

Respondent's figures, showing a comparison of the partners' capital accounts that reflect minimum gain chargebacks, are as follows:

|              |             | Dondi/       |              |
| Date         | THEI        | Manchester   | Total        |
|--------------|-------------|--------------|--------------|
| 12-31-91     | $2,092,861  | $15,794,195  | $17,887,056  |
| 12-31-90 **minus** | 1,231,959 | 15,096,796 | 16,328,755 |
| Increase     | 860,902     | 697,399      | [1]1,558,301 |

[1] These figures do not take into account a dispute over an adjustment in IHCL's ordinary income for 1991 of $16,402, an issue which we address infra p. 41.

Respondent concludes that, because a deemed liquidation would produce the above results, its allocation of all the net income to THEI after June 20, 1991, reflects the partners' interests in the partnership.

The Issue Revisited

The contrast between respondent's and petitioner's theories of the comparative liquidations arises from petitioner's contention that a deemed liquidation of IHCL must also involve a deemed liquidation of Landmark and Gateway and the resulting minimum gain chargebacks.

In our initial examination of this issue, we agreed with respondent. In Interhotel I, we held that IHCL, as a minority owner of Landmark and Gateway, lacked the legal capacity to force Landmark and Gateway to dispose of the property that generated the nonrecourse deductions. Accordingly, upon liquidation, IHCL could only dispose of its partnership interests in Landmark and Gateway. Those partnerships, however, would continue to own the hotel properties. In the absence of some other event that triggered minimum gain chargebacks (such as a repayment of the principal of

the nonrecourse loans with new capital or profits from operations), we concluded that a liquidation of IHCL under the comparative liquidation test would not increase the partners' capital accounts sufficiently to eliminate THEI's deficit account. Therefore, because Mr. Manchester would continue to have the only positive capital account on liquidation, we concluded that he alone would be entitled to the liquidation proceeds. Thus, we sustained respondent's determination that Mr. Manchester was chargeable with all of IHCL's income for 1991 under the comparative liquidation test.

Petitioner revised its argument on appeal to maintain that there need not be a deemed sale of the hotel properties in order to trigger the minimum gain chargebacks. On appeal, petitioner argued that to generate such chargebacks, it would suffice that IHCL, a pass-through beneficiary of the nonrecourse deductions, had terminated its pass-through connection to the properties. Respondent, having considered this revised argument, agreed. In view of respondent's concession as to the minimum gain chargebacks, the Court of Appeals vacated our earlier decision and remanded the case to us.

Following the Court of Appeals' remand of this case, we instructed the parties either to submit an agreed decision document or to file written status reports advising how we should implement the Court of Appeals' mandate. The parties filed status reports

informing us that neither party desired an evidentiary hearing. We then ordered the parties to file briefs addressing the issues on remand with appropriate computations in support of their respective positions.

It is apparent that respondent's concession effectively removes the basis for our original decision; namely, that a deemed liquidation of IHCL would not trigger a minimum gain chargeback. Petitioner now asserts that respondent's concession requires a determination in petitioner's favor. Petitioner maintains that a comparative liquidation of IHCL in 1990 and in 1991 would produce minimum gain chargebacks to THEI in both years, which chargebacks would be sufficient to eliminate THEI's negative capital account. The result is that both partners would have positive capital accounts. Accordingly, petitioner maintains, the requirement that liquidation proceeds be paid in accordance with positive capital accounts shows that its allocations reflect the partners' economic interests in the partnership. Respondent, however, contends that, notwithstanding his concession, our original decision was correct, based upon alternative evidentiary and legal arguments.

Initially, in his brief on remand, respondent maintains that petitioner has failed to substantiate the amounts of the partnership minimum gains at issue. We disagree. We reviewed this matter thoroughly during the trial of this case and see no reason to revisit this issue. Petitioner produced its accountant's work

papers, which reflected how the amount of partnership minimum gain would be derived. Petitioner's accountant substantiated these figures through his testimony. We found the accountant's work papers both accurate and internally consistent and the accountant's testimony credible.

We are not persuaded otherwise by respondent's assertion that petitioner's work papers are inconsistent with Schedule L of the subsidiary partnerships' tax returns. Respondent correctly maintains that the amount of depreciation for Landmark reflected on the work papers for 1990 exceeds the amount reflected on the balance sheets attached to Form 1065, U.S. Partnership Return of Income, for the same year. Petitioner, however, has explained that the discrepancy results from utilizing highly accelerated forms of depreciation then available for real estate on the accountant's work papers, while the balance sheets for Landmark, included on its returns, were book balance sheets reflecting slower depreciation rates. A schedule entitled "tax depreciation" in Form 1065 substantiates the use of depreciation schedules, which produced higher figures than those on the balance sheets reflected on Schedule L of the same return. Moreover, the amounts of claimed depreciation set forth in Forms 1065, U.S. Partnership Return of Income, for 1989, 1990, and 1991 are identical to the figures utilized in the accountant's work papers used to compute both Landmark's minimum gain and IHCL's share of that minimum gain. In

the absence of further evidence, we again accept petitioner's figures as accurate.

Next, respondent contends that, even if petitioner has proved the amount of IHCL's partnership minimum gain, petitioner improperly included this amount in the liquidation proceeds. Respondent argues that the minimum gain chargeback is only an allocation of income, not income itself. Accordingly, respondent concludes that, absent evidence that a liquidation of IHCL would produce economic income or gain, it is improper to include minimum gain in the figures produced by a liquidation.

In our opinion, respondent misperceives the function of the minimum gain chargeback. Section 1.704-1T(b)(4)(iv)(a)(2), Temporary Income Tax Regs., 53 Fed Reg. 53162 (Dec. 30, 1988), states that when the amount of nonrecourse liability exceeds the basis of the partnership's property securing it, "a disposition of such property will generate gain in an amount that is at least equal to such excess." (Emphasis supplied.) Although this "phantom" gain does not exist in the form of cash, it nevertheless is taken into account for tax purposes.

The regulations explain the relation of this phantom gain to nonrecourse deductions as follows:

> Although an allocation of nonrecourse deductions cannot have economic effect, the amount of nonrecourse deductions allocated to any partner decreases such partner's capital account. Similarly, although the allocation to a partner of partnership minimum gain that is attributable to nonrecourse deductions claimed by the

partnership increases the partner's capital account, the allocation cannot have economic effect because the minimum gain merely offsets nonrecourse deductions previously claimed by the partnership and does not necessarily bear any relationship to the value of partnership property. Thus, minimum gain that is attributable to nonrecourse deductions claimed by the partnership must be allocated to the partners that were allocated such nonrecourse deductions to prevent such gain from impairing the economic effect of other partnership allocations. * * * [Id.]

The regulations thus implement the Tufts doctrine that deductions based on nonrecourse financing will later be offset by increased income, even though that income is not realized in an economic sense. Here, IHCL had passed through nonrecourse deductions to its partners. The regulations require that a subsequent deemed liquidation of IHCL generates gains, albeit noncash, to offset previously claimed deductions. Those gains increase the upper tier partners' capital accounts pro tanto. Respondent's insistence that a deemed liquidation must produce actual economic gains to offset nonrecourse deductions is inconsistent with the logic of Tufts.

Other provisions of the regulations do not mandate a different result. Respondent refers to language of section 1.704-1T(b)(4)(iv)(e)(2), Temporary Income Tax Regs., 53 Fed. Reg. 53163 (Dec. 30, 1988), to the effect that if there is a net decrease in partnership minimum gain, then each partner "must be allocated items of income and gain for such year (and, if necessary, for subsequent years)". Respondent argues the parenthetical language

refers to situations where the net decrease in partnership minimum gain in a taxable year exceeds the income and gain of the partnership for that taxable year. In such cases, respondent maintains, the excess amount of the decrease in minimum gain must be carried over and treated as a decrease in partnership minimum gain for the following years, at least to the extent there is equivalent partnership income and gain in those years. From this premise, respondent argues that the regulations restrict any minimum gain chargeback to the amount of partnership income or gain realized in a given taxable year. Accordingly, respondent asserts, "before it can charge back any of the net decrease in partnership minimum gain to the partners, petitioner must show that IHCL realized income or gain on the liquidation." Respondent then points to his earlier conclusion that IHCL would have a loss on liquidation, and concludes that, because there is not income or gain on the liquidation, no minimum gain chargeback is allowed.

We are not persuaded by respondent's argument. We believe that the quoted language does not apply to situations, such as that here, where minimum gain chargebacks are generated by the disposition of property in which the partnership's nonrecourse liabilities exceed its basis. In the latter situation, the regulations provide that sufficient gain will be generated automatically, by operation of the Tufts principle, to equal the amount of the minimum gain chargeback. As the regulations state,

such dispositions of property will automatically generate gain "in an amount that is at least equal to" the minimum gain that must be charged back.  Sec. 1.704-1T(b)(4)(iv)(a)(2), Temporary Income Tax Regs., supra.  There is thus no occasion to carry over any "excess" of a decrease in minimum gains.[4]

Respondent also attacks petitioner's assumption that the allocation of minimum gain will suffice to offset IHCL's negative capital account.  Respondent argues that even if THEI properly included IHCL's partnership minimum gain in the computation of the liquidation proceeds, IHCL improperly allocated enough of its partnership minimum gain to THEI to offset THEI's negative capital account.  Respondent maintains that IHCL "has not computed each partner's share of partnership minimum gain."

We disagree.  As noted above, petitioner has demonstrated to our satisfaction that IHCL's share of the minimum gain chargeback was $7,369,977 at the end of 1990, and $7,437,891 at the end of 1991.  Moreover, the applicable regulations provide that each

---

[4]    The regulations, however, do not provide that other types of decreases in partnership minimum gain will, by themselves, generate gain.  For example, a partnership may choose to pay down the principal of its nonrecourse debt.  That payment would diminish the amount by which the partnership's liability exceeds its basis in the property.  Hence, the payment would decrease minimum gain.  The parenthetical language in the regulation quoted by respondent apparently refers to that possibility.  In such cases, where the net decrease in minimum gain exceeds annual income or gain, that language appears to require allocations of minimum gain for subsequent years.  That matter, however, is not presently before us.

partner must be allocated items of income and gain to the extent of the <u>greater of</u> (1) the partner's share of the decrease in minimum gain allocable to the disposition of partnership property subject to nonrecourse liabilities, <u>or</u> (2) the deficit balance in such partner's capital account at the end of the year. See sec. 1.704-1T(b)(4)(iv)(<u>e</u>)(<u>2</u>), Temporary Income Tax Regs., <u>supra</u>. Here, even according to respondent's calculations, THEI's share of the decrease in minimum gain allocable to the disposition of property is $3,042,812.[5] THEI's negative capital account at the end of 1990, however, was $5,920,614. Under the regulations, THEI is allocated the greater of these amounts, that is, $5,920,614. Under the comparative liquidation test, allocation of the latter amount automatically is sufficient to eliminate THEI's negative capital account.

Nor are we persuaded by respondent's related contention that, before taking into account any minimum gain chargebacks, THEI's negative capital account of $5,920,614 must be increased by a deemed obligation to restore $3,042,812. As noted above, this amount represents respondent's computation of THEI's share of the decrease in minimum gain allocable to the disposition of property. Respondent contends that this restoration would provide a negative

---

[5] Petitioner questions the accuracy of the $3,042,812 figure. Because of our resolution of this issue, we need not, and do not, make specific findings as to whether the figure is correct.

capital account of $2,877,802. Respondent then notes that section 1.704-1T(b)(4)(iv)(e)(2), Temporary Income Tax Regs. requires that each partner must be allocated items of income and gain to the extent of the greater of (1) the partner's share of the decrease in minimum gain allocable to the disposition of partnership property subject to nonrecourse liabilities, or (2) the deficit balance in such partner's capital account at the end of the year. Under respondent's theory, THEI would be entitled to a minimum gain chargeback of only $3,042,812, its share of the minimum gain chargeback, because that amount would be greater than the recalculated deficit in its capital account of $2,877,802.

Respondent's argument that THEI must increase its capital account is based upon an erroneous reading of the regulations. The regulations state:

> For purposes of §1.704-1(b)(2)(ii)(d) [the alternative test for economic substance], the amount of a partner's share of partnership minimum gain shall be added to the limited dollar amount, if any, of the deficit balance in such partner's capital account that such partner is obligated to restore. * * * [Sec. 1.704-1T(b)(4)(iv)(f)(2), Temporary Income Tax Regs., 53 Fed. Reg. 53164 (Dec. 30, 1988).]

This provision of the regulations is specifically designed to provide a means for nonrecourse deductions to meet the alternative test for economic substance, described supra. The regulations do so by treating a partner's share of a minimum gain chargeback as an amount the partner is required to restore to his or her capital account. In the present case, however, neither the IHCL Original

Agreement nor the IHCL Restated Agreement meets the alternative test for economic substance because such agreements fail to provide a QIO. See supra pp. 14-15. Accordingly, there is no "deemed obligation" that THEI restore to its capital account its alleged $3,042,812 share of the decrease in minimum gain allocable to the disposition of property. Even if THEI had such an obligation, that obligation would not operate to reduce the amount allocable to THEI under the minimum gain chargeback. The regulations provide that such a restoration obligation is performed only "(after taking into account * * * any changes during such year in partnership minimum gain and in the minimum gain attributable to any partner nonrecourse debt)". Sec. 1.704-1T(b)(4)(iv)(e)(2)(ii), Temporary Income Tax Regs., supra. (Emphasis added.) In this case, the antecedent changes in such minimum gain were their total elimination by operation of the Tufts principle in the partnership regulations. After such changes, there was no minimum gain, and no partner could have a share of minimum gain to restore to its capital accounts.

Substantiality

The comparative liquidation test of section 1.704-1(b)(3)(iii), Income Tax Regs., is ineffective if the economic effect of the resulting allocations is "insubstantial" under section 1.704-1(b)(2)(iii), Income Tax Regs. In general, this requirement of substantiality requires "a reasonable possibility

that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences." Id. An allocation is not substantial under these regulations if the allocation enhances the after-tax economic position of at least one partner, and it is likely that the after-tax consequences of none of the other partners will be diminished. See sec. 1.704-1(b)(2)(iii)(a), Income Tax Regs.

The requirement of substantiality is another provision designed to ensure that allocations reflect economic reality. Here, IHCL has allocated its annual income away from Mr. Manchester, who succeeded to Dondi's large capital account, to THEI, which had a substantial negative capital account. This special allocation had an economic effect because it operated first to eliminate THEI's negative capital account and, by creating a positive capital account for THEI, then to increase THEI's share of IHCL's assets to be received on liquidation. The special allocation also ended Mr. Manchester's claims to additional income. The economic benefit to THEI and economic detriment to Mr. Manchester combined to prevent the reallocation from failing the requirement of the substantiality test. Accordingly, not only is the special allocation consistent with the partners' interests in

the partnership, it is also "substantial" within the meaning of section 1.704-1(b)(3)(iii), Income Tax Regs.[6]

The Facts and Circumstances Regulations

Both parties have made alternative arguments based upon the broad factors enumerated in the regulations as appropriate for consideration in resolving issues of partners' interests. The relevant regulations provide that "The determination of a partner's interest in a partnership shall be made by taking into account all facts and circumstances relating to the economic arrangement of the partners." Sec. 1.704-1(b)(3)(i), Income Tax Regs. Because of our holding with respect to the comparable liquidation test, there is no need to revisit the "facts and circumstances" issue.

Deficiencies After Remand

Respondent, in his brief on remand, presented an issue that is not directly related to inclusion of the minimum gain chargeback in the comparative liquidation test. Respondent maintains that the recalculated deficiencies should include a correction to the decision submitted by the parties as a basis for the earlier decision. That correction concerns the treatment of an asserted

---

[6] The comparative liquidation test also requires that the result of the liquidations be adjusted for the items described in (4), (5), and (6) of sec. 1.704-1(b)(2)(ii)(d), Income Tax Regs. See sec. 1.704-1(b)(3)(iii)(b), Income Tax Regs. Respondent asserts that these provisions, described under the "alternate test" of economic substance, supra, are inapplicable here. Petitioner does not disagree.

constructive distribution of $16,402 to IHCL.  Petitioner argues that such correction cannot be made on remand; we disagree.

The "law of the case" doctrine states that the decision of the appellate court must be respected on remand, but the binding effect of this doctrine does not extend to issues the appellate court did not address.  United States v. Cote, 51 F.3d 178, 181 (9th Cir. 1995).  Under the similar, but broader "rule of mandate", we may not entertain a proceeding inconsistent with the remand.  Id. Neither doctrine precludes a technical correction to reflect an earlier agreement of the parties that was neither affirmed nor addressed by the Court of Appeals when it vacated and remanded our earlier decision.  The decision should reflect the correct tax liability.

To reflect the foregoing and the parties' concessions,

Decision will be entered under Rule 155.