T.C. Memo. 2011-102

UNITED STATES TAX COURT

RICK FISHMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14514-06.          Filed May 18, 2011.

<u>J. Timothy Bender</u> and <u>J. Scott Broome</u>, for petitioner.

<u>Cathy J. Horner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Petitioner and his wife, Mary Ann Fishman (the Fishmans, and petitioner's wife alone, Mrs. Fishman), timely filed joint Federal income tax returns for tax years 1994, 1995, 1996, and 1997 (the tax years at issue).  Respondent issued a statutory notice of deficiency covering the tax years at issue to the Fishmans on May 9, 2006.  The notice stated that respondent

had determined the following deficiencies and penalties with respect to their Federal income taxes:

| Year | Deficiency | Penalty Sec. 6663(a) |
|------|-----------|----------------------|
| 1994 | $13,878 | $10,409.50 |
| 1995 | 14,415 | 10,811.25 |
| 1996 | 14,692 | 11,019.00 |
| 1997 | 15,304 | 11,478.00 |

Petitioner timely filed a petition with this Court challenging the deficiencies and penalties.[1]  Petitioner resided in Indiana when he filed his petition.

This case presents one issue for decision:  whether underpayments due to fraud exist for the tax years at issue such that, because of the fraud:  (1) Petitioner is liable for civil fraud penalties under section 6663(a)[2] and (2) the period of limitations on assessment does not bar assessment of the proposed deficiencies and penalties.  The Court holds that no underpayments due to fraud exist.  Therefore, petitioner is not liable for civil fraud penalties, and the period of limitations

---

[1]Petitioner and Mrs. Fishman originally filed separate petitions.  The Court consolidated their cases on Oct. 21, 2009.  Respondent and Mrs. Fishman later agreed to settle her case at docket No. 14515-06, and on Mar. 12, 2010, after the date of trial in the instant case, the Court severed the previously consolidated cases.  The Court then entered a stipulated decision in Mrs. Fishman's case on Apr. 5, 2010.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the tax years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

bars assessment of the proposed deficiencies. As a result, the Court need not otherwise address the correctness of the proposed deficiencies, including the computational adjustments.[3]

## FINDINGS OF FACT

### I. Petitioner's Career With United Group Association

Some of the facts have been stipulated and are found accordingly. The stipulations of fact and the attached exhibits are incorporated herein by this reference. In 1988 when the Fishmans lived in Cleveland, Ohio, petitioner became a sales representative for United Group Association (UGA). As a sales representative, petitioner was a self-employed independent contractor of UGA. His responsibilities included marketing and selling to other self-employed individuals insurance policies for life, health, dental, vision, and prescription drug coverage, as well as memberships in the National Association for the Self-Employed (NASE).

In a little over a year UGA promoted petitioner to district sales leader (district leader); he remained a self-employed independent contractor. As a district leader, petitioner continued his previous duties of marketing and selling insurance and NASE memberships. He also took on new responsibilities such as recruiting, hiring, training, managing, and motivating a team

---

[3]Specifically, respondent adjusted petitioner's self-employment tax deductions and liability, his medical expense deductions, and his earned income tax credits.

of sales representatives. The sales representatives in petitioner's district were also self-employed independent contractors.

When petitioner became a district leader, he began doing business as PACE Associates (PACE). Petitioner formed and operated PACE as a sole proprietorship and reported income (or loss) from PACE on Schedules C, Profit or Loss From Business, of the Fishmans' joint returns. Petitioner also opened and maintained a bank account for PACE, from which he paid all expenses relating to his business.

In 1991 UGA promoted petitioner again, this time to division sales leader (division leader). Petitioner remained a self-employed independent contractor and continued to do business as PACE. His new division covered the entire State of Indiana, so the Fishmans moved to Indianapolis, where they remained throughout the tax years at issue. Petitioner held the position of division leader throughout the tax years at issue.

As a division leader, petitioner retained the same general responsibilities--sell insurance and NASE memberships and recruit, hire, train, manage, and motivate a sales team. His new sales team, however, consisted not only of sales representatives but also of district leaders. Specifically, during the tax years at issue petitioner had between 3 and 5 district leaders and between 40 and 60 sales representatives in his division. The

district leaders and sales representatives in petitioner's division were all self-employed independent contractors. Petitioner continued to work for UGA until 2008, when he left the insurance industry.

II. UGA's Commission Advance System

UGA paid its agents[4] solely on commission. Commissions were earned as monthly insurance premiums were paid. Specifically, when an agent sold an insurance policy, for the first 12 months the policy was in effect he would earn a sales commission equal to 20 percent of the policy's monthly premiums. For each subsequent month the policy remained in effect, he would earn a sales commission equal to 4 percent of the monthly premium. Thus, agents earned larger commissions from selling new policies than from maintaining existing policies.

Sales leaders earned two types of commission. First, they earned sales commissions on policies they personally sold. Second, they earned commissions on their subordinate[5] agents' sales. UGA called this second type of commission an override.

---

[4]For convenience, the Court will use the term "agents" to refer to division leaders, district leaders, and sales representatives combined. The Court will also use the term "sales leaders" to refer to division leaders and district leaders combined.

[5]The Court uses the term "subordinate" loosely. Recall that all UGA agents were self-employed independent contractors.

UGA recognized that earning commissions only as monthly premiums were paid might prevent agents from initially earning adequate commissions to cover their living expenses.[6]  To address these concerns, UGA used a commission advance system.  Under this system, when an agent sold a policy, UGA would advance (i.e., lend) the agent approximately 6 months' anticipated but unearned commissions.  As the monthly premiums on that policy were paid, UGA would apply the earned commissions against the advance (i.e., as repayment of the loan).  Thus, after approximately 6 months, earned commissions would fully offset the advance.  As a result, agents who consistently sold new policies would have as cash on hand approximately 5 to 6 months' anticipated but unearned commissions.  If premium payments discontinued within the first 6 months, however, UGA would collect from the agent any portion of the advance not offset by earned commissions.  An advance not offset by earned commissions carried simple interest at rates ranging from 1 to 1.5 percent, and the agent had a contractual duty to repay whether or not he continued to earn commissions.

Because the advances were loans bearing a stated rate of interest, UGA did not report them as compensation to its agents on Forms 1099-MISC, Miscellaneous Income.  Rather, UGA reported only earned commissions as compensation.  Specifically, for tax

---

[6]An agent would have to sell a substantial number of policies and keep them on the books to live solely on earned commissions.

year 1996, when UGA issued Forms 1099-MISC to its agents, UGA included a document that explained the commission advance system. The document explained the income-reporting implications of the system, provided an illustration of how the system worked, and alerted its agents to "start planning today for 1997's tax liability!"[7]

The commission advance system applied to petitioner's division during all tax years at issue. Each week UGA would approve new policies sold by agents in petitioner's division. Upon approving the policies, UGA would wire-transfer the entire division's weekly advances to the PACE account and would send to petitioner a summary document specifying the advance amounts for each agent, including petitioner. Petitioner was responsible for writing checks to the other agents in his division as per the UGA summary document, which he did. Of course, petitioner retained in the PACE account his own advances on personal sales and overrides.

---

[7]Petitioner provided this document to his certified public accountant (C.P.A.) along with other documents pertaining to tax year 1996. The document was also in the possession of the Internal Revenue Service (IRS). See infra note 15 and accompanying text.

III. Expenses Petitioner Paid on Behalf of the District Leaders

Petitioner paid various expenses on behalf of the district leaders in his division.[8] For example, if a district leader shipped something using petitioner's Federal Express (FedEx) or United Parcel Service (UPS) account number, petitioner paid the entire FedEx or UPS bill. Petitioner also paid the costs of running advertisements for the district leaders. In addition, if a district leader made a long-distance phone call, petitioner paid the entire phone bill. Lastly, one district leader needed a fax machine, so petitioner bought the fax machine for the district leader.[9]

While petitioner initially paid these expenses, the district leaders eventually reimbursed him.[10] Rather than sending bills to the district leaders showing their expenses--which would have required the district leaders to write reimbursement checks to petitioner each week--petitioner obtained reimbursement directly

---

[8]Petitioner also incurred and paid expenses to run his division that were not on the district leaders' behalf. Such expenses included those for office rent, utilities, equipment, advertising, travel, and meals and entertainment. Petitioner deducted these expenses on Schedules C of the Fishmans' joint returns.

[9]Petitioner also paid a "Management Package Fee" on behalf of each district leader. No evidence exists regarding this fee other than its amount, which was approximately $150 to $200 per week per district leader.

[10]Petitioner was not reimbursed for the other expenses he paid to run his division. See supra note 8.

by deducting the expenses from the district leaders' commission advance checks. Specifically, petitioner would review any invoices, bills, and receipts containing such expenses and would note on a sheet of paper the expense types and amounts, as well as the names of the district leaders on whose behalf petitioner had initially paid the expenses. Each week petitioner would transfer the information on the sheet of paper to balance sheets he prepared for the district leaders. On a given balance sheet petitioner noted, among other things: (1) The district leader's weekly advance amount as per the UGA summary document and (2) the expenses he had paid on behalf of that district leader. Petitioner subtracted these expenses from the UGA-prescribed advance amounts and wrote checks to the district leaders for the net amounts.[11] He also provided copies of the balance sheets to the district leaders. During the tax years at issue petitioner prepared between three and five balance sheets per week and obtained repayment for expenses he had paid on the district leaders' behalf of $54,549, $51,996, $63,159, and $59,241, respectively.

---

[11]Petitioner was not always reimbursed in full every week. For example, the district leader for whom petitioner initially purchased the fax machine reimbursed him over multiple weeks, as if making installment payments on the purchase.

IV. The Fishmans' Joint Tax Returns

For each tax year at issue petitioner prepared a summary list of what he believed to be his Schedule C business expenses. He sent the lists, his Forms 1099-MISC, and Mrs. Fishman's Forms W-2, Wage and Tax Statement, to his C.P.A. Petitioner occasionally provided his C.P.A. with other information relevant to his tax return preparation. Specifically, for tax year 1996, petitioner provided to his C.P.A.: (1) The document from UGA outlining the income-reporting implications of the commission advance system and (2) information regarding petitioner's stock purchase plan with UGA.

Petitioner prepared the summary lists using a rather rudimentary method. Petitioner took what he called a "vacation" from his normal UGA duties for approximately 1 week each year. During these weeks, which he spent in his home, petitioner compiled all of the division's expense receipts and the district leaders' balance sheets for the respective tax year. Petitioner would then take the balance sheets for a district leader and determine the total amount of expenses he initially paid on that district leader's behalf (for which he had been reimbursed).[12] He would then begin adding up the expense receipts for his

---

[12]Petitioner viewed these expenses as the district leaders' "[expenses] to help the division grow." In other words, petitioner viewed the expenses to be the district leaders' business expenses rather than his own.

division.  When the dollar amount of the receipts reached the amount of expenses petitioner had paid on that district leader's behalf, he would set those receipts and that district leader's balance sheets aside.  Petitioner would repeat this process for each district leader in his division.

After completing this process, petitioner added up and categorized the <u>remaining</u> expense receipts and reported the amounts as Schedule C business expenses on the summary lists he sent to his C.P.A.  See <u>supra</u> note 7.  Because petitioner set aside receipts up to the amount of the reimbursed expenses, the summary lists neither included those expenses as Schedule C business deductions nor reported the reimbursements as Schedule C gross receipts.  Consequently, the C.P.A. did not include the expenses as business deductions or the reimbursements as gross receipts on the Fishmans' joint returns.

V. <u>The IRS Criminal Investigation of Petitioner</u>

In 1998 special agents from respondent's Criminal Investigation Division (CID) contacted petitioner concerning an investigation into PACE's finances and the Fishmans' joint returns.  CID terminated the investigation sometime in 2003 without initiating criminal prosecution against petitioner.  The record contains no evidence concerning:  (1) The details of the investigation; (2) what prompted CID to open the investigation; (3) why criminal prosecution was not initiated; or (4) whether

CID ever notified petitioner that it had terminated the investigation.

VI. <u>Subsequent Civil Audit and Notice of Deficiency</u>

In December 2003 respondent assigned the audit of the Fishmans' tax years 1994, 1995, 1996, and 1997 to Revenue Agent Kay Shoaf (revenue agent). CID delivered to the revenue agent 10 boxes of materials it had collected during its investigation. In April 2004 petitioner provided the revenue agent with six additional boxes of documents. These boxes contained bank statements, checks, receipts mostly organized in monthly packets, charge card statements, and telephone, shipping, and advertising bills. Despite having six boxes of documents containing expense receipts, the revenue agent analyzed only the telephone, shipping (FedEx and UPS), and advertising expenses. She observed that, while the amounts of these expenses did not exceed the amounts reported on the Fishmans' joint returns, they did exceed the amounts for which petitioner was reimbursed by the district leaders. The revenue agent could not, however, determine whether the expenses she reviewed were reported as Schedule C deductions on the Fishmans' joint returns. The revenue agent did not review receipts corresponding to any other expense items on the joint returns.

The revenue agent did create spreadsheets based on information contained in the joint returns, IRS computer

databases, the weekly balance sheets, and letters petitioner wrote to his C.P.A. One spreadsheet the revenue agent created reflects the stipulated amounts of expenses petitioner paid on behalf of the district leaders for which he was reimbursed. Aside from the spreadsheets, however, the record contains nothing prepared by the revenue agent during her audit. The revenue agent never spoke with the Fishmans or the C.P.A. during the course of her audit. She completed her audit in August 2004.

On May 9, 2006, almost 2 years after the revenue agent completed her audit, respondent determined deficiencies in the Fishmans' Federal income taxes for the tax years at issue. The deficiency determinations resulted primarily from respondent's adjustment to petitioner's gross income.[13] Specifically, the notice of deficiency stated:

> It is determined that you received reimbursement for business expenses claimed on your returns * * * which were not reflected on your return. These reimbursements are <u>taxable income to you under the provisions of Section 61</u> of the Internal Revenue Code. Alternatively, your other business expenses are decreased by the amount of reimbursements you received. [Emphasis added.[14]]

---

[13]All other adjustments reflected in the notice of deficiency were computational. See <u>supra</u> note 3.

[14]While respondent in the notice of deficiency uses the term "taxable income" to articulate his determination, the reference to sec. 61 and the statements surrounding the term clearly indicate that respondent's determination focused on petitioner's gross income (as opposed to taxable income or adjusted gross income as defined in secs. 63 and 62, respectively).

Notably, the notice of deficiency did not reflect a determination that petitioner had overstated any specific deductions he claimed on his Schedules C. In addition, the notice of deficiency reflected no adjustment to gross income related to the commission advances petitioner received from UGA. In fact, the revenue agent never saw or considered the UGA document explaining the commission advance system during her audit, even though she admitted that the 16 boxes of information she had may have contained that document.[15]

OPINION

I. Underpayments Due to Fraud Do Not Exist.

A taxpayer is liable for a civil fraud penalty if, acting with fraudulent intent, he underpays the Federal income tax required to be shown on his return. Sec. 6663(a). In other words, fraud consists of two elements: (1) Underpayment of tax and (2) fraudulent intent. To establish fraud, the Commissioner must prove both elements with clear and convincing evidence.[16] Secs. 7454(a), 7491(c); Rule 142(a)(2), (b); DiLeo v.

---

[15]See supra note 7 and accompanying text.

[16]The taxpayer's mere failure to prove error in the Commissioner's deficiency determination does not, without more, satisfy the Commissioner's burden for either element. Gromacki v. Commissioner, 361 F.2d 727, 730 (7th Cir. 1966), affg. T.C. Memo. 1964-292; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

<u>Commissioner</u>, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

Respondent has not proven the first element--that petitioner underpaid his Federal income tax.  The Commissioner may initially establish that a taxpayer underpaid his Federal income tax by producing clear and convincing evidence that the taxpayer failed to report specific transactions that gave rise to gross income. See, e.g., <u>United States v. Shavin</u>, 320 F.2d 308, 311 (7th Cir. 1963); <u>Peyton v. Commissioner</u>, T.C. Memo. 2003-146 (citing <u>Siravo v. United States</u>, 37 F.2d 469, 473-474 (1st Cir. 1967), <u>Elwert v. United States</u>, 231 F.2d 928, 933 (9th Cir. 1956), <u>United States v. Bender</u>, 218 F.2d 869, 871-872 (7th Cir. 1955), and <u>United States v. Stayback</u>, 212 F.2d 313, 317 (3d Cir. 1954)).  This method of establishing an underpayment is called the specific items method of proof.[17]  See <u>Price v. Commissioner</u>, T.C. Memo. 2004-103.  If, using this method, the Commissioner produces clear evidence of unreported gross income, the taxpayer must then prove by a preponderance of the evidence that he incurred, but did not

---

[17]The Commissioner can also employ the specific items method by producing clear and convincing evidence of specific items of overstated deductions.  See <u>Beauchamp v. Commissioner</u>, T.C. Memo. 1997-393 (sustaining fraud penalty for portion of underpayment related to overstated alimony deductions).  However, respondent did not produce any evidence--much less clear and convincing evidence--that petitioner overstated any specific deductions. Rather, respondent focuses solely on whether the reimbursements petitioner received constituted gross income that petitioner failed to report.

report, enough deductible costs or expenses to offset the unreported income.  See United States v. Bender, supra at 871-872; Peyton v. Commissioner, supra.  If, however, the Commissioner improperly characterizes a nonincome item as gross income, he fails to meet his initial burden and, as a result, the taxpayer need not produce evidence of offsetting expenses.  Cf. United States v. Bender, supra at 871-872 (stating that the burden of production shifts to the taxpayer "when the Government has shown unreported income").

Respondent determined deficiencies based solely on the following two-pronged argument:  (1) Petitioner paid expenses on behalf of the district leaders and deducted the expenses on his Schedules C;[18] (2) the district leaders eventually reimbursed petitioner for these expenses, and the reimbursements constituted gross income to petitioner, which he omitted from his return.  To establish an underpayment based on this position, respondent must produce clear and convincing evidence that the reimbursements

_____

[18]The Court recognizes that, as part of his determination, respondent asserted that petitioner had deducted the reimbursed expenses on his Schedules C.  See supra p. 12.  That assertion does not, however, equate to a determination that petitioner overstated specific items of deduction.  See supra note 17. Rather, the essence of respondent's determination is that, while petitioner correctly reported his Schedule C deductions, he underreported his gross receipts.

In any event, petitioner employed a system--albeit rudimentary--to deduct only those business expenses for which he had not been reimbursed.  See supra pp. 10-11.  Thus, the Court finds that petitioner did not report the reimbursed expenses on his Schedules C.

were properly characterized as gross income.  See <u>United States v. Bender</u>, <u>supra</u> at 871; <u>Peyton v. Commissioner</u>, <u>supra</u>.

Respondent claims that petitioner conceded that he underreported gross income.  If a taxpayer concedes that he failed to report gross income, his concession may serve as the evidence the Commissioner needs to satisfy his initial burden. <u>Karcho v. Commissioner</u>, T.C. Memo. 2000-213.  Absent such a concession, however, the Commissioner must produce actual evidence of unreported gross income.  See <u>United States v. Bender</u>, 218 F.2d 869, 871 (7th Cir. 1955); <u>Peyton v. Commissioner</u>, <u>supra</u>.

Contrary to respondent's claim, petitioner did not concede that he underreported <u>gross income</u>.  Respondent relies on two stipulated facts to support his claim:  (1) Petitioner received reimbursements for expenses PACE paid on behalf of the district leaders; and (2) petitioner did not report the reimbursements as gross income.  These two stipulations, however, do not constitute a concession that the reimbursements constitute gross income pursuant to section 61.[19]

---

[19]Petitioner argues that, while he "has never denied that he received expense reimbursements * * * for expenses that PACE paid or incurred on behalf of the District Sales Leaders", he never conceded that he had unreported gross income.  Specifically, petitioner's brief states:  "The only dispute is over <u>whether Petitioner realized additional taxable income as a result of [the] reimbursements</u> or if the reimbursements were offset by other business expenses incurred and paid by the Petitioner".

(continued...)

Generally, gross income does not include reimbursements for expenses a taxpayer pays on behalf of another.  Price v. Commissioner, T.C. Memo. 1999-142 (citing Gray v. Commissioner, 10 T.C. 590, 596-597 (1948)).  Morever, a taxpayer generally cannot deduct such expenses because, when the taxpayer obtains reimbursement, the expenses have been paid not by the taxpayer but by the person who reimbursed the taxpayer.[20]  Universal Oil Prods. Co. v. Campbell, 181 F.2d 451, 475 (7th Cir. 1950) (citing Glendinning, McLeish & Co. v. Commissioner, 61 F.2d 950, 952 (2d

---

[19](...continued)
[Emphasis added.]  This statement is consistent with his petition, which specifically assigns error to respondent's determination that petitioner "realized taxable income * * * for the alleged reimbursement of business expenses."

To be sure, gross income and taxable income do not mean the same thing.  See secs. 61, 63.  Thus, to argue that a taxpayer did not receive additional taxable income generally does not equate to an argument that he did not receive additional gross income.  However, the notice of deficiency uses the term "taxable income" when referring to gross income "under the provisions of Section 61".  See supra note 14 and accompanying text.  Thus, the Court views petitioner's use of the term as simply corresponding with respondent's determination regarding unreported gross income, as opposed to an argument focused specifically on taxable income as prescribed by sec. 63.

[20]Only under limited circumstances may a taxpayer deduct expenses for which he obtains reimbursement.  See, e.g., secs. 62(a)(2)(A), 274(a), (e)(3); secs. 1.62-1(c)(2), 1.62-2, 1.162-17, 1.274-2(f)(2)(iv), Income Tax Regs.; sec. 1.62-1T(e), Temporary Income Tax Regs., 53 Fed. Reg. 9874 (Mar. 28, 1988).  Accordingly, only under limited circumstances does mere receipt of reimbursements give rise to gross income.  See, e.g., sec. 62(a)(2)(A); sec. 1.162-17(b), Income Tax Regs. (regulating how employee taxpayers must report certain expenses and any reimbursements received therefor).  None of those circumstances apply in this case.

Cir. 1932), affg. 24 B.T.A. 518 (1931)).  In other words, the taxpayer merely advances (i.e., lends) the payment to the other person or business, and the other person or business returns (i.e., repays) the advanced amount at a later time.  Flower v. Commissioner, 61 T.C. 140, 152 (1973), affd. without published opinion 505 F.2d 1302 (5th Cir. 1974); see Commissioner v. Tufts, 461 U.S. 300, 307 (1983).

The two stipulated facts respondent relies upon establish only that petitioner initially paid the expenses and that the district leaders eventually reimbursed him.  They do not establish that petitioner could have properly deducted the expenses as his own business expenses.  In fact, respondent ignores the most important stipulation--the district leaders were self-employed independent contractors.  They had no employment or contractual relationship with PACE or petitioner.  As independent contractors, they carried on their own businesses separate from PACE.  See World Wide Agency, Inc. v. Commissioner, T.C. Memo. 1981-419.  Thus, any expenses the district leaders paid or incurred that were ordinary and necessary to their businesses would not be directly attributable to PACE and therefore would not be deductible by petitioner.  See secs. 62(a)(1), 162(a); Glendinning, McLeish & Co. v. Commissioner, supra at 952; Phila.-Balt. Stock Exch. v. Commissioner, 19 T.C. 355, 359 (1952); sec. 1.162-1(a), Income Tax Regs.; sec. 1.62-1T(c)(1), Temporary

Income Tax Regs., 53 Fed. Reg. 9873 (Mar. 28, 1988). Because the stipulated facts do not represent a concession that petitioner could have deducted the reimbursed expenses as his own business expenses, they cannot represent a concession that the reimbursements were properly characterized as gross income. Therefore, respondent must produce actual evidence that the reimbursements constitute gross income.

Respondent has not produced sufficient evidence to characterize the reimbursements as gross income. Respondent acknowledges that petitioner used the reimbursement system merely as a substitute for billing the district leaders weekly and having them write checks to reimburse petitioner for the outlays. Inherent in this acknowledgment is that, by the end of each year, the district leaders ultimately paid the expenses.

Petitioner's testimony, which the Court finds credible, further supports this view of the reimbursements. Petitioner viewed the expenses as the district leaders' "[expenses] to help the division grow". Despite using a rudimentary method, petitioner segregated the expenses ultimately paid by the district leaders from those ultimately paid by PACE. Petitioner listed only the expenses ultimately paid by PACE on the documents he sent to his C.P.A., who prepared petitioner's tax returns.[21]

_____

[21]Petitioner's method only matched the amounts of the receipts to the amounts on the balance sheets. Thus, while the
(continued...)

Furthermore, petitioner provided the weekly balance sheets showing the nature and amount of the reimbursable expenses to the district leaders. These balance sheets served as summary tax documentation that enabled: (1) Petitioner to determine the total expenses paid by the district leaders during the tax years at issue and (2) the district leaders to substantiate their business expenses on their tax returns.

Simply put, respondent has not produced clear and convincing evidence that the reimbursements constitute gross income.[22] Rather, petitioner's receipt of the reimbursements gave rise to nothing more than a loan repayment. Because receiving repayment

---

[21](...continued)
character of the expenses on the receipts may not have matched the character of the expenses on the balance sheets, respondent made no determination that the character of any of petitioner's expenses should be adjusted. See supra note 17.

[22]Respondent also argues in his posttrial briefs that "the commission advances he received from UGA are income to petitioner upon his exercise of dominion and control over the funds in the bank account". Respondent makes this argument despite the facts that the revenue agent never saw or considered UGA's policy document regarding the commission advance system during her audit and that respondent did not determine that the commission advances constituted gross income to petitioner. The Court need not consider this argument raised for the first time after trial. Centel Commcns. Co. v. Commissioner, 920 F.2d 1335, 1340 (7th Cir. 1990) (citing Knowlton v. Commissioner, 791 F.2d 1506, 1511 (11th Cir. 1986), affg. 84 T.C. 160 (1985)), affg. 92 T.C. 612 (1989). In any event, UGA required petitioner to distribute the advances to the agents in his division. The system imposed a contractual obligation upon the agents to repay UGA for any unearned advances, which bore a stated rate of interest. Thus, the advances did not constitute gross income to petitioner when UGA wire-transferred the amounts to the PACE account.

of a loan does not give rise to gross income, respondent has not met his initial burden.  Thus, petitioner need not produce evidence of offsetting expenses.  Therefore, the Court holds that respondent has not proven that petitioner underpaid the Federal income tax required to be shown on his returns for the tax years at issue.  Because respondent did not prove that petitioner underpaid his Federal income tax during the tax years at issue, the Court need not discuss whether petitioner acted with fraudulent intent.  See Jenkins v. United States, 313 F.2d 624, 627 (5th Cir. 1963); Elfmon v. United States, 209 F.2d 642, 643 (4th Cir. 1954).  Accordingly, petitioner is not liable for civil fraud penalties pursuant to section 6663(a).

II. The Period of Limitations Bars Assessment of the Proposed Deficiencies.

Respondent conceded that, if he could not prove fraud, the period of limitations would bar assessment of the proposed deficiencies.  Respondent has not proven fraud.  Thus, the period of limitations bars assessment of the proposed deficiencies.[23]

To reflect the foregoing and the concessions of the parties,

Decision will be entered

for petitioner.

---

[23]Because respondent cannot assess the proposed deficiencies (including the computational adjustments), the Court need not otherwise determine their correctness.  See supra note 3 and accompanying text.